## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re:<br><br>**JOSEPH J. TERNDRUP,**<br><br>      **Debtor.** | |
| **CHARI PACK and CHARI VENTURES, LLC,**<br><br>      **Plaintiffs,**<br><br>v.<br><br>**JOSEPH J. TERNDRUP,**<br><br>      **Defendant.** | **Case No. 25-44558-elm7**<br><br>**Chapter 7**<br><br>**Adversary Proceeding No. _____** |

---

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

---

Plaintiffs Chari Pack and Chari Ventures, LLC ("Plaintiffs" or "Pack") seek a determination that debts owed by Defendant Joseph J. Terndrup are nondischargeable under 11 U.S.C. § 523(a)(6), § 523(a)(2)(A), and § 523(a)(4) and a denial of discharge under § 727(a)(2)(A) and § 727(a)(4)(A).

## I.      NATURE OF THE PROCEEDING

1.      This adversary proceeding arises from a preplanned scheme through which Defendant Joseph J. Terndrup (the "Debtor") migrated operational control, revenue streams, and legal title of a going-concern business to an insider entity while eliminating recovery for Pack.

2.      In connection with Pack's sale of the Persnickety Prints Business to Debtor in June 2023, Pack held two seller-financing promissory notes totaling $572,000, a security interest in business assets, and an absolute and unconditional personal guaranty from the Debtor.

3.      The Debtor's conduct destroyed Pack's recovery rights and rendered the personal guaranty uncollectible. Beginning in January 2025—six months before any foreclosure—the Debtor caused revenue from the Persnickety Prints Business to flow to an insider acquisition entity (Uplily, LLC) while the operating entity obligated to Pack (Persnickety, LLC) retained debt but lost cash flow. When the Persnickety Prints Business was ultimately sold in July 2025 for a fraction of its value, it was sold exclusively to that same insider entity, which the Debtor controlled and from which he received compensation. By that point, the "sale" merely formalized legal title to a business the insider entity had already been operating and monetizing for six months.

4.      The resulting deficiency under Pack's notes and guaranty is the direct consequence of the Debtor's revenue diversion, operational migration, and insider transfer at inadequate consideration—conduct designed to preserve the Persnickety Prints Business for the Debtor's benefit while ensuring Pack recovered nothing.

5.      Pack seeks a determination that the debts owed under the notes and guaranty are nondischargeable under 11 U.S.C. § 523(a)(6) (willful and malicious injury), or in the alternative under § 523(a)(2)(A) (actual fraud, including asset-transfer schemes recognized in *Husky Int'l Elecs., Inc. v. Ritz,* 578 U.S. 356 (2016)), and in the further alternative under § 523(a)(4) (embezzlement). Pack further requests that this Court deny the Debtor a discharge under 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A) based on a broader fraudulent transfer scheme that was concealed in his bankruptcy petition.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157.

7.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations of dischargeability of particular debts).

8.      Venue is proper under 28 U.S.C. § 1409(a).

9.      This Complaint is timely under Fed. R. Bankr. P. 4007(c).

### III.      PARTIES

10.     Plaintiff Chari Pack is an individual residing in Utah.

11.     Plaintiff Chari Ventures, LLC is a Utah limited liability company.

12.     Defendant Joseph J. Terndrup is the debtor in the above-captioned Chapter 7 case. The Debtor filed a voluntary petition under Chapter 7 on November 21, 2025. At all relevant times, the Debtor resided in Texas.

### IV.      FACTUAL ALLEGATIONS

**A.      The June 2023 Acquisition and Pack's Bargained-For Rights**

13.     On June 14, 2023, Persnickety Prints, LLC and Chari Pack (as "Sellers") entered into an Asset Purchase Agreement (the "APA") to sell the assets and operations of the Persnickety Prints e-commerce business (the "Persnickety Prints Business") to Persnickety Co, an entity owned and controlled by the Debtor.[1]

14.     The purchase price was $2,700,000. The APA allocated $2,524,060 to intangibles and goodwill, with the remainder allocated to equipment, inventory, and other tangibles.

15.     The transferred assets included all property necessary to operate the Persnickety Prints Business as a going concern, including equipment and inventory; intellectual property, including registered trademarks for "Persnickety Prints"; domain names, including

---

[1] "Persnickety" refers to the buyer entity operating the acquired Persnickety Prints Business, including any subsequent conversion or renaming as Persnickety, LLC, which Debtor caused to occur after the June 2003 sale. "Uplily" refers to Uplily, LLC, the insider acquisition entity described below. "SWC" refers to Second Wind Consultants, Inc.

PersnicketyPrints.com; e-commerce platforms and websites; social media accounts; customer lists and databases; vendor relationships; marketing materials; goodwill; and business systems and access credentials.

16.     On June 27, 2023, the transaction closed pursuant to a First Amended Asset Purchase Agreement. The Debtor executed the closing documents as President of Persnickety Co., including the notes, Security Agreement, and Guaranty (individually).

17.     The purchase price was financed through: (a) a Small Business Administration loan from Veritex Community Bank in the approximate principal amount of $2,048,695, secured by a first-priority security interest in the Persnickety Prints Business assets (the "Veritex Loan"); and (b) seller financing from Pack consisting of two promissory notes.

18.     The June 27, 2023 closing documents include: (a) a $300,000 Promissory Note requiring monthly payments of $3,366.22 beginning October 1, 2023 (the "$300k Note"); (b) a $272,000 Standby Promissory Note (the "$272k Note"); (c) a Security Agreement granting Pack a security interest (junior to Veritex) in all business assets (the "Security Agreement"); and (d) an Unconditional Guaranty executed by the Debtor personally (the "Guaranty").

19.     The Guaranty executed by the Debtor is expressly "absolute and unconditional," is governed by Utah law, and provides that the Debtor as guarantor waives defenses based on the obligor's financial condition and certain actions taken with respect to collateral. The Guaranty obligates the Debtor to pay all amounts due under the notes, together with interest, fees, costs, and attorneys' fees.

20.     Following the acquisition, the Persnickety Prints Business operated under the Debtor's control and generated $1,805,466 in online sales from 29,214 customer orders in calendar

year 2024, with similar online sales the following year in 2025; however, beginning in 2025, Debtor began diverting the Persnickety Prints Business's online sales to a new entity called Uplily.

### B.    The Debtor's Portfolio Debt and Public Statements

21.    Between 2020 and 2023, the Debtor acquired multiple e-commerce businesses using SBA-guaranteed loans and seller financing, each supported by his personal guaranty.

22.    During the period of his acquisitions, the Debtor publicly promoted himself as an expert in small-business acquisitions and passive-income strategies under the pen name "Joseph Drups." The Debtor published materials describing the use of SBA loans and seller financing to acquire businesses and generate cash-flow returns. The Debtor's publications tout the success of the businesses and the passive income stream he created with them.

23.    As reflected in the Debtor's bankruptcy schedules, the Debtor listed $5,223,370.69 in personally guaranteed obligations. The scheduled obligations include: (a) Pinnacle Financial Partners (SBA) $901,145.51 and $1,484,439.64; (b) Veritex Community Bank (SBA for Persnickety) $1,958,702.15; (c) Chari Pack $267,603.05 and $272,000.00 (the principal balances on the two notes described above); (d) DLW Ventures, Inc./Dan Watkins $61,480.34 and $113,000.00; and (e) Christina Peterson $165,000.00.

24.    The foregoing obligations were secured by assets of the respective businesses acquired and operated through entities controlled by the Debtor.

25.    The magnitude of the Debtor's personally guaranteed obligations—exceeding $5.2 million—supplied motive to implement a structure that would transfer operational control and legal title to an insider entity, preserving the Persnickety Prints Business and the other businesses for the Debtor's benefit while shedding acquisition debt and personal liability on guaranties.

26.    These public statements evidence the Debtor's sophistication in leveraged acquisitions and his understanding of strategies for operational restructuring and asset transfers.

### C.    Engagement of Consultants and the Decision to Default

27.    On July 2, 2024, the Debtor engaged Second Wind Consultants, Inc. ("SWC") through a portfolio-wide Business Consulting Agreement covering five entities controlled by the Debtor: UNDG F&P, LLC; Sunny Lark, LLC; Persnickety, LLC; DrupsCo, LLC; and Drups Ventures, LLC.

28.    The SWC agreement recites that the client entities "have made the independent decision to default" and describes SWC's role as designing and implementing asset sales as "the foundation of the re-organization."

29.    The SWC Program Schedule identified debts to be targeted, including the Veritex Loan and Pack's two seller-financed notes.

30.    The Debtor granted SWC a power of attorney to negotiate with creditors and to address financial and business issues across the portfolio entities. SWC's fees under the July 2024 agreement totaled at least $185,000.

31.    On December 23-27, 2024, a second SWC engagement for Sunny Lark, LLC added approximately $167,000 in fees and identified the Debtor as "CEO of Persnickety LLC."

32.    The SWC engagements documented advance planning to default on portfolio obligations—including Pack's debt—and to implement coordinated asset-sale transactions.

### D.    Formation and Capitalization of Uplily

33.    On August 27, 2024—approximately eight weeks after the SWC engagement— Uplily, LLC was formed as a Texas limited liability company.

34.    Texas public records list Aren Voyles as the managing member of Uplily with a stated capital contribution of $1,000. The Debtor was designated as Manager of Uplily with authority to manage and control the entity.

35.     Aren Voyles was an employee of Debtor's Sunny Lark operations in Burleson, Texas, who Debtor allegedly found though a job posting on Indeed.com.

36.     Voyles contributed only $1,000 in capital to Uplily. And no additional capital was ever contributed to Uplily beyond the initial $1,000 capital contribution.

37.     Electronic signature audit logs for Uplily's Operating Agreement, executed September 28-30, 2024, reflect that the Debtor authored the Operating Agreement and was the first signatory.

38.     Pursuant to a scheme planned and approved by Debtor, SWC prepared Uplily's formation documents and filed its Certificate of Formation with the Texas Secretary of State. The Debtor testified that he uploaded the Operating Agreement himself and that it was based on templates provided by SWC.

39.     Based on a referral from SWC, Uplily later financed business acquisitions using debt from Dune Funding at 20% annual interest.

40.     The formation of Uplily—with minimal capitalization, nominal ownership by the Debtor's employee, managerial control retained by the Debtor, formation through the consultants engaged to implement the debt-default-asset-sale strategy, and governance documents created by the Debtor using SWC templates—positioned Uplily as a vehicle to receive income-generating business assets while the operating businesses owned by Debtor shed debt and Debtor sought to discharge his personal guaranties.

**E.      The Uplily Operating Agreement: Contractual Domination and Control**

41.     The Uplily Operating Agreement, executed September 28-30, 2024, vested exclusive operational and transactional control in the Manager—the Debtor.

42.     The Operating Agreement provides that "overall management and control of the business and affairs of the LLC" rests with the Manager, and that any action taken by a Manager

"shall bind the LLC," with the "signature of any Manager" alone sufficient to bind the company without additional approvals.

43.     The Debtor is the sole Manager of Uplily under the Operating Agreement with full authority and control over the company.

44.     The Operating Agreement granted the Debtor structural control that could not be overridden by the nominal Member. The Debtor was authorized to unilaterally designate additional Managers at any time. If more than one Manager existed, any Manager could bind the company, and in the event of disagreement, "Manager, Joseph Terndrup, will unilaterally and at its own discretion make the final determination."

45.     The Debtor retained direct control over Uplily's money flow and financial infrastructure. The Operating Agreement grants the Manager discretion over distributions of net cash flow, authority over LLC bank accounts and receipts, and designates the Debtor as the company's "tax matters partner."

46.     The Operating Agreement placed membership and governance changes under Manager control. Voyles is the sole nominal member. And no Member may transfer any interest without Manager consent, and unauthorized transfers are void. The Manager holds a right of first refusal to purchase a departing Member's interest. Additional Members may be admitted only with Manager approval. Amendments to the Operating Agreement are classified as "Major Decisions" requiring Manager approval and must be executed by the Manager to be effective.

47.     Through these provisions, the Debtor retained the contractual ability to (i) control Uplily's business and finances unilaterally; (ii) control asset acquisitions and contracts; (iii) control distributions and banking; (iv) appoint or override other managers; (v) block or approve ownership

changes; (vi) admit himself or affiliates as Members; (vii) amend the Operating Agreement; and (viii) restructure ownership after asset transfers.

48.    The Operating Agreement established Uplily as an insider entity contractually dominated by the Debtor, enabling him to receive compensation, control transferred business operations, and preserve economic benefits of the Persnickety business while shedding personal guaranty liability.

**F.    Pre-Transfer Revenue Diversion and Operational Migration: The January 2, 2025 Licensing Structure**

49.    In 2024, pursuant to the SWC scheme, the Debtor's portfolio entities began defaulting on their SBA loan obligations.

50.    On January 2, 2025—pursuant to the SWC scheme—various businesses executed trademark license agreements within minutes of one another, including: (i) Persnickety, LLC to Uplily; (ii) UNDG F&P, LLC to Uplily; and (iii) Sunny Lark, LLC to Uplily. These agreements are referred to collectively as the "License Agreements."

51.    Each License Agreement granted Uplily a five-year non-exclusive license to use the licensor's trademarks in exchange for a 5% royalty on sales made using the licensed marks.

52.    The Debtor created each License Agreement and signed on behalf of the licensor entities, including signing as "Persnickety LLC Owner" for the Persnickety-to-Uplily license. Voyles signed on behalf of Uplily as licensee.

53.    The License Agreements were executed approximately six months before the July 2025 transfer of legal title described below. The agreements pre-positioned Uplily to operate the portfolio businesses and siphon off net sales revenues using the sham license in advance of any foreclosure.

54.     Following execution of the License Agreements, Uplily began operating the Persnickety Prints Business using the licensed trademarks, domain names, e-commerce platforms, and associated access credentials.

55.     Following the January 2025 licensing arrangements, revenues from Persnickety-branded sales were deposited directly into bank accounts controlled by Uplily rather than Persnickety's accounts, with Uplily retaining 95% of all net sales while Persnickety remained obligated for 100% of debt service.

56.     The License Agreements contemplated that Persnickety would receive a 5% royalty on sales made using the licensed marks.

57.     Even if Uplily paid the full 5% royalty, the licensing structure diverted 95% of net sales to Uplily while Persnickety remained obligated to service 100% of its debt to Veritex Community Bank and to Pack. This revenue diversion materially impaired Persnickety's ability to meet payment obligations under the Veritex Loan and Pack's notes, precipitating the defaults described below.

58.     In parallel with the revenue diversion, employees supporting Persnickety's day-to-day operations were moved to Uplily's payroll. By the end of the first quarter of 2025, Persnickety no longer maintained a separate workforce for core functions such as sales, order fulfillment, customer service, or marketing, all of which were usurped under Uplily's operational control.

59.     The Debtor drained all cash out of Persnickety, including by paying himself a salary without performing any work for the business, and then effective June 1, 2025, began receiving direct compensation from Uplily.

60.     The January-to-July 2025 operational migration—sham licensing of intellectual property, actual diversion of revenue into Uplily's bank accounts, transfer of workforce, and

commencement of Debtor compensation from Uplily—stripped Persnickety of its revenue-generating capacity and operational infrastructure. This migration ensured that by the time of the July 2025 foreclosure, Persnickety was a shell entity and any "sale" would transfer legal title to a business Uplily had already been operating and monetizing for six months. The migration directly caused the destruction of Pack's recovery rights. Persnickety could not generate cash flow to satisfy Pack's notes, and the subsequent sale at a fraction of value to an insider entity left nothing for Pack as a creditor or under the Guaranty.

## G.    Insider Transfers from Other Portfolio Entities

61.    On June 2, 2025, two other entities controlled by the Debtor—UNDG F&P, LLC and Sunny Lark, LLC—transferred substantially all of their assets to Uplily through private Article 9 sales for approximately $69,000 and $31,000, respectively.

62.    The Debtor executed the transaction documents on behalf of the selling entities. Voyles executed the agreements on behalf of Uplily as the acquiring entity.

63.    Both transactions closed through escrow at Todrin Law Group, an entity associated with SWC, with Brock & Grey serving as broker.

64.    These June 2, 2025 transactions—occurring shortly before the Persnickety transfer—involved the same insider buyer (Uplily, controlled by the Debtor as Manager), the same transaction structure (comprehensive "all assets" transfers at compressed pricing), and the same intermediaries (Todrin Law Group and Brock & Grey), establishing a pattern that would be replicated in the Persnickety transaction.

## H.    Defaults and Pack's Notice

65.    By early 2025, Persnickety had defaulted on payment obligations under the Veritex Loan.

66.    By May 2025, Persnickety defaulted on monthly payment obligations due under the $300k Note held by Pack.

67.    On July 17, 2025, Pack sent a written Notice of Default to Persnickety and to the Debtor personally, invoking Pack's rights under the APA, the notes, the Security Agreement, and the Guaranty, and demanding cure of the defaults. The defaults were not cured.

68.    Despite other contemporaneous communications between Pack and Debtor, he chose to keep the truth of his scheme a secret and did not personally notify Pack of the foreclosure process or the transfers to Uplily.

**I.    The Insider Transfer to Uplily**

69.    On July 15, 2025, Veritex Community Bank issued a "Notification of Disposition of Collateral" stating that a public sale of collateral would be held on July 25, 2025 at the offices of Todrin Law Group in Dallas, Texas. Pack did not receive notice of the sale until after it occurred.

70.    The notification attached an exhibit describing the collateral in terms that emphasized tangible personal property, specifically referencing "all equipment including but not limited to heat presses, printers, cutting machines, computers, and office equipment."

71.    The collateral remained physically located at the Persnickety Prints Business's operating premises in Orem, Utah. The notification directed prospective bidders to contact a Dallas, Texas address for inspection arrangements. Pack only discovered what had happened after the sale closed. This was by design. Uplily as the insider buyer with Debtor in control was already in possession of an operating the Persnickety Prints Business and siphoning off its net sales and cash with the sham license agreement. The plan had been in place for nearly a year.

72.    The notification did not specifically identify or emphasize the intangible assets that comprised the substantial majority of the Persnickety Prints Business's going-concern value, including trademarks, domain names, e-commerce platforms and websites, customer lists and

databases, social media accounts, e-commerce login credentials, vendor relationships, and goodwill.

73.    On July 18, 2025—one day after Pack sent its Notice of Default—Veritex Community Bank, Persnickety, and Uplily executed a "Secured Party Sales Agreement and Asset Transfer Agreement" providing for a private sale of the collateral to Uplily for $115,000, less an 8% broker commission (the "Private Sale Agreement").

74.    The Private Sale Agreement granted Uplily an exclusive right to acquire the assets, with exclusivity running for 90 days and closing to occur on or before July 31, 2025. The transaction was structured to close through Todrin Law Group as escrow agent and Brock & Grey as broker—the same intermediaries used in the June 2, 2025 transfers to Uplily.

75.    The Debtor executed the Private Sale Agreement on behalf of Persnickety, signing as "Manager/Owner." Voyles executed the agreement on behalf of Uplily, signing as "Member." The Debtor thus signed the transaction documents on both sides of the sale.

76.    The Private Sale Agreement's Exhibit A describes the transferred assets as "all personal property of Debtor," specifically including: all tangible personal property; all intellectual property, including trademarks, patents, copyrights, and trade secrets; all domain names and websites; all customer lists and proprietary databases; all social media accounts and online platforms; all e-commerce system access and login credentials; and all other general intangibles necessary to operate the Persnickety Prints Business.

77.    The July 15 notification emphasized tangible equipment. The July 18 Private Sale Agreement conveyed "all personal property" including the full suite of intangible assets described above. The 90-day exclusivity provision eliminated any competitive process or market test of value.

78.     The transaction closing statement reflects a gross sale price of $115,000, an 8% broker commission of $9,200, and net proceeds to Veritex Community Bank of $105,800.

79.     On July 28, 2025, a Bill of Sale was executed transferring all personal property from Persnickety to Uplily for $115,000. The Bill of Sale was signed by a representative of Veritex Community Bank as secured party and seller, by Voyles on behalf of Uplily as buyer, and by the Debtor on behalf of Persnickety as debtor.

80.     On July 28, 2025, the Debtor executed a Voluntary Surrender Agreement on behalf of Persnickety, in his capacity as individual guarantor, and on behalf of DrupsCo, LLC. The Voluntary Surrender Agreement confirmed the Veritex principal balance as $1,958,702.15 and included borrower and guarantor waivers of challenges to the disposition process.

81.     Pack was not a party to the Voluntary Surrender Agreement and did not waive any rights. The secured lender's foreclosure process is alleged as context for the timing, structure, and exclusivity of the insider transfer and the Debtor's knowledge that Pack would recover nothing.

**J.      Intellectual Property Consolidation and Backdated Assignments**

82.     On July 25, 2025, the United States Patent and Trademark Office recorded assignments of multiple trademark registrations from UNDG F&P, LLC to Uplily. The assignment documents reflect execution dates of June 2, 2025.

83.     On September 18, 2025, the USPTO recorded assignments of the "PERSNICKETY PRINTS" trademark registrations from Persnickety, LLC to Uplily. The assignment documents reflect execution dates of June 2, 2025.

84.     The Debtor submitted these trademark assignment filings to the USPTO. The June 2, 2025 execution dates—approximately six weeks before the July 18-28 Persnickety transfer—further demonstrate that intellectual property consolidation in Uplily was planned and

executed in advance of any foreclosure, corroborating the advance planning reflected in the SWC agreements and the January 2025 License Agreements.

**K.    Post-Transfer Continuity of Operations and Debtor Control**

85.    Following the July 2025 transfer, the Persnickety Prints Business continued to operate without interruption under the "Persnickety Prints" brand, using the same e-commerce platforms, websites, domain names, customer lists, vendor relationships, and operational processes.

86.    By July 2025, the transfer of legal title to Uplily merely formalized ownership of a business that Uplily had been operating and monetizing since January 2025 through the licensing structure and operational migration described above.

87.    On June 1, 2025—one day before Uplily acquired the assets of UNDG F&P and Sunny Lark, and approximately seven weeks before the Persnickety transfer—the Debtor entered into a compensation and transition services arrangement with Uplily.

88.    Upon information and belief, the Debtor received continuous compensation from Uplily beginning June 1, 2025, including periods in which he was classified as a 1099 independent contractor, periods beginning November 14, 2025 in which he was classified as a W-2 employee, and a subsequent return to 1099 contractor status in December 2025.

89.    The Debtor testified that he remained Uplily's Manager at all times following the formation of Uplily and continuing through the filing of his bankruptcy petition. The Debtor retained authority over Uplily's day-to-day operations and received compensation tied to the Persnickety Prints Business operations he had transferred to Uplily.

90.    A September 9, 2025 letter from the landlord of the Orem, Utah premises references the transition of the lease to a "new company" and describes Persnickety as "merging with a new company," evidencing continuity of business operations.

**L.      Consideration, Revenue Performance, and Going-Concern Value**

91.      During the time leading up to and continuing through execution of the Uplily license and liquidation sale, the Persnickety Prints Business was generating at least $1.8 million in annual online revenue, plus additional wholesale and storefront revenue, and possessed valuable intangible assets, including registered trademarks, established domain names and web presence, an active customer base and customer lists, vendor relationships, and operational goodwill.

92.      The stated purchase price was $115,000.

93.      The $115,000 price is materially lower than the $2.7 million purchase price the Debtor paid to acquire the same business in June 2023. The $115,000 price represents approximately 6 to 7 percent of annual revenue and approximates the liquidation value of tangible equipment, notwithstanding that the Private Sale Agreement expressly conveyed the full going-concern asset package, including all intellectual property, domain names, customer lists, e-commerce credentials, and goodwill.

**M.      Pack's Injury**

94.      Pack bargained for and received contractual payment rights under two promissory notes, a security interest in the Persnickety Prints Business assets, and an absolute and unconditional personal guaranty from the Debtor.

95.      Pack's recovery rights depended on the preservation of Persnickety Prints Business value and cash flow and, upon any default, the enforcement of those rights through payment under the Guaranty or through the application of sale proceeds according to creditor priority.

96.      The Debtor's conduct destroyed Pack's recovery rights. The cash and net sales diversion that began in January 2025—including the actual deposit of Persnickety-branded sales revenues into Uplily's bank accounts—stripped Persnickety of cash flow, ensuring defaults to Veritex Community Bank and to Pack. The July 2025 transfer of legal title to Uplily for $115,000—

16

representing a fraction of going-concern value and occurring through an exclusive insider transaction that eliminated any competitive process—ensured that no proceeds would be available for Pack as a creditor.

97.    Pack received no proceeds from the $105,800 in net disposition proceeds paid to Veritex Community Bank.

98.    As reflected in the Debtor's bankruptcy schedules, Pack's allowed claim as of the petition date totals $539,603.05, comprising $267,603.05 under the $300k Note and $272,000 under the $272k Note, plus continuing interest, late fees, costs, and attorneys' fees as provided in the notes and Guaranty.

99.    The deficiency under Pack's notes and Guaranty is the direct result of the Debtor's revenue diversion, operational migration, and insider transfer at inadequate consideration—conduct designed to preserve the Persnickety Prints Business for the Debtor's benefit while ensuring Pack recovered nothing.

### N.    Bankruptcy Filing and Advance Planning

100.    On November 21, 2025, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

101.    In his Statement of Financial Affairs, the Debtor stated that Persnickety's operations "ceased" and that its assets were "sold off" on or about June 27, 2025.

102.    The Private Sale Agreement was executed on July 18, 2025, and the Bill of Sale and Voluntary Surrender Agreement were executed on July 28, 2025.

103.    The transaction was a pre-planned debt avoidance scheme and was not commercially reasonable. The fraudulent transfer was carefully planned for nearly a year and effectuated through the operational migration that began in January 2025, rather than as a result of any independent foreclosure process in July 2025. The January 2025 revenue diversion and

operational migration, not the July 2025 legal formalities, constituted the true "transfer" of the Persnickety Prints Business to Uplily.

104.    The Debtor's bankruptcy schedules omitted his ongoing role as Manager of Uplily, LLC. The Debtor testified at his Rule 2004 examination that his bankruptcy petition should be amended to disclose his Manager roles in Uplily and in another entity, HoldingCo.

105.    The omission of the Debtor's Manager role from his bankruptcy schedules is further evidence of concealment of ongoing control over the Persnickety Prints Business and the other businesses he transferred to Uplily while seeking discharge of his personal guaranty obligations.

106.    The Debtor's bankruptcy filings also reference litigation pending in the United States District Court for the District of Utah (Case No. 2:25-cv-00947), in which Pack asserts claims against the Debtor and related parties for breach of contract, breach of guaranty, civil conspiracy to defraud creditors, fraudulent transfers under the Utah Uniform Voidable Transactions Act, violations of UCC Article 9, and unjust enrichment.

## V.    CLAIMS FOR RELIEF

### COUNT I – NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(6)
### (WILLFUL AND MALICIOUS INJURY)

107.    Pack realleges and incorporates the facts pleaded above.

108.    Under 11 U.S.C. § 523(a)(6), a debt is nondischargeable if it arises from "willful and malicious injury by the debtor to another entity or to the property of another entity."

109.    Conduct is "willful" if the debtor engaged in intentional conduct and either subjectively intended to cause injury or knew that injury was substantially certain to result from the conduct. *Kawaauhau v. Geiger,* 523 U.S. 57, 61-62 (1998). Both prongs are satisfied here. Debtor subjectively intended to eliminate Pack's recovery by orchestrating a scheme in which he used substantial debt to acquire businesses, caused the businesses to default on that debt, diverted

revenues to an insider entity he controlled through license agreements, coordinated the sale of business assets at liquidation values to that same insider entity, and then filed bankruptcy seeking to discharge the acquisition debt while retaining control and economic benefits from the businesses through the insider entity. At minimum, Debtor knew with substantial certainty that this conduct would destroy Pack's ability to recover under the notes and guaranty.

110.    The Debtor willfully and maliciously injured Pack's contractual and recovery rights by deliberately implementing a preplanned scheme to divert operational control and revenues to an insider entity and to transfer legal title to that entity, all designed to preserve the Persnickety Prints Business and its benefits for the Debtor while eliminating Pack's recovery.

111.    The Debtor acted willfully. The Debtor engaged in deliberate, intentional conduct that he knew was substantially certain to destroy Pack's ability to recover under the notes and Guaranty:

a.  Engaging consultants who memorialized an "independent decision to default" and were tasked with designing asset-sale transactions affecting Pack's debt;

b.  Forming Uplily as an undercapitalized acquisition vehicle—capitalized with only $1,000 and no additional meaningful equity—with nominal ownership by the Debtor's employee, managerial control contractually vested in the Debtor, and governing documents drafted by the Debtor using SWC templates;

c.  Structuring Uplily's Operating Agreement to vest exclusive control in the Debtor as Manager, including unilateral authority to bind the company, control distributions and banking, appoint or override other managers, block ownership changes, admit members, amend the Operating Agreement, and make all final determinations in the event of any disagreement;

d.  Executing the January 2, 2025 License Agreements—contemporaneous with SBA defaults across the portfolio—to shift revenue generation and operational control to Uplily months in advance of any foreclosure, while Persnickety retained 100% of debt obligations but received at most 5% of net sales;

e.  Causing Persnickety-branded sales revenues to be deposited directly into Uplily's bank accounts rather than Persnickety's accounts, as admitted by the Debtor in his Rule 2004 examination;

f.  Migrating workforce and business systems to Uplily and receiving personal compensation from Uplily beginning June 1, 2025;

g.  Transferring assets from other Debtor-controlled entities to Uplily on June 2, 2025, using the same transaction structure and intermediaries that would be employed in the Persnickety transfer;

h.  Executing the July 18, 2025 Private Sale Agreement one day after receiving Pack's Notice of Default, granting Uplily 90-day exclusivity, and transferring "all personal property" for $115,000;

i.  Signing transaction documents on behalf of both Persnickety and Uplily, thereby controlling the terms, timing, and structure to favor the Debtor's interests;

j.  Failing to personally notify Pack of the foreclosure or transfer, claiming that Veritex and SWC were responsible for creditor notifications; and

k.  Continuing to manage and operate the Persnickety Prints Business through Uplily under contractual control provisions that could not be overridden by the nominal member, receiving compensation from Uplily, omitting his Manager role from his bankruptcy schedules, and seeking discharge of the Guaranty in bankruptcy.

112.   The harm to Pack's recovery was the substantially certain and intended consequence of the Debtor's conduct. The Debtor knew that diverting 95% of net sales to Uplily while Persnickety retained 100% of debt would cause defaults. The Debtor knew that transferring legal title exclusively to Uplily for a fraction of value would eliminate any recovery for Pack as a creditor or under the Guaranty. The Debtor's background as a published author on acquisition strategies using SBA loans and seller financing demonstrates sophisticated knowledge and orchestration of this scheme, making his conduct particularly egregious.

113.   The Debtor knew of Pack's debt, knew of his Guaranty obligations, and knew that Pack's recovery depended on the preservation of business value and cash flow. Nonetheless, the Debtor proceeded with conduct designed to defeat Pack's interests and preserve the Persnickety Prints Business for his own benefit. The Debtor intentionally acted in a way that was designed to injure Pack's creditor rights while implementing the transfer scheme.

114.   The debt owed to Pack under the notes and Guaranty is a debt "for" willful and malicious injury. Pack's deficiency is directly and proximately caused by the Debtor's revenue diversion, operational migration, and insider transfer at inadequate consideration. The injury to Pack was not incidental but was the intended and substantially certain result of the Debtor's scheme.

115.   Accordingly, the debt owed by the Debtor to Pack is excepted from discharge under 11 U.S.C. § 523(a)(6).

### COUNT II (ALTERNATIVE) – NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2)(A) (ACTUAL FRAUD)

116.   Pack realleges and incorporates the facts pleaded above.

117.   Under 11 U.S.C. § 523(a)(2)(A), a debt is nondischargeable to the extent it was "obtained by" actual fraud. The Supreme Court has held that "actual fraud" encompasses

fraudulent conveyance schemes—including schemes designed to hinder, delay, or defraud creditors through asset transfers—even in the absence of a false representation made directly to the creditor. *Husky Int'l Elecs., Inc. v. Ritz,* 578 U.S. 356, 361-62 (2016).

118.    Even if the original debt had been obtained through a facially legitimate transaction in June 2023 (and not as part of a pre-planned debt shedding scheme, which is disputed), the debt became "obtained by" fraud under *Husky* when the Debtor executed a scheme that rendered the debt uncollectible while preserving the Persnickety Prints Business assets for his own benefit. The scheme transformed Pack's secured debt into an unsecured deficiency through the Debtor's fraudulent asset transfers, making the unpaid debt a debt "obtained by" actual fraud within the meaning of § 523(a)(2)(A).

119.    The Debtor executed and benefited from a scheme to hinder and delay Pack's ability to recover on its debt while preserving the Persnickety Prints Business and its economic benefits for the Debtor.

120.    The scheme included coordinated steps designed to migrate operational control and revenues to an insider entity in advance of any foreclosure and to transfer legal title exclusively to that insider entity at a fraction of value: engaging consultants to design a default-and-transfer strategy; forming Uplily as an undercapitalized insider vehicle with contractual governance provisions guaranteeing the Debtor's exclusive control and using templates provided by those same consultants; executing License Agreements to shift revenues and operations to Uplily beginning in January 2025, contemporaneous with SBA defaults; causing Persnickety-branded revenues to be deposited into Uplily's bank accounts; transferring assets from other Debtor-controlled entities to Uplily on June 2, 2025; executing the Private Sale Agreement on July 18, 2025 (one day after Pack's default notice) with 90-day exclusivity to Uplily; signing on both sides

of the transaction; consolidating intellectual property in Uplily through backdated assignments; failing to notify Pack directly; continuing to manage and receive compensation from Uplily under contractual provisions vesting final decision-making authority in the Debtor; omitting his Manager role from bankruptcy schedules; and seeking discharge of the Guaranty.

121.    Pack was a known creditor. The Debtor's scheme obstructed Pack's ability to enforce its contractual and security rights and eliminated any prospect of recovery. These circumstances reflect badges of fraud, including (i) transfer to insider; (ii) retention of possession or control; (iii) concealment; (iv) transfer of substantially all debtor's assets; (v) insolvency or threatened insolvency; (vi) transfer shortly before or after substantial debt or threatened collection; (vii) grossly inadequate consideration; and (viii) pattern of transfers to same transferee. The presence of multiple badges establishes actual intent to hinder, delay, and defraud Pack.

122.    Indicia of actual fraud support the conclusion that the Debtor's conduct was designed to hinder, delay, or defraud Pack:

a.  The transferee (Uplily) was an insider entity controlled by the Debtor through contractual provisions guaranteeing the Debtor's domination, capitalized with only $1,000, and nominally owned by the Debtor's employee;

b.  Consideration was grossly inadequate (approximately 6 to 7 percent of annual revenues);

c.  The Debtor retained control and benefit post-transfer, continuing as Uplily's Manager with contractual authority that could not be overridden and receiving compensation;

d.  The timing demonstrates planning and responsiveness to creditor action;

e.  Actual diversion of cash with Persnickety-branded revenues deposited into Uplily accounts as admitted by the Debtor;

  f. Secrecy and exclusivity suppressed competitive interest: 90-day exclusivity to Uplily eliminated any market process, and the Debtor failed to personally notify Pack of the transfers;

  g. Concealment of ongoing control with the Debtor omitting his Manager role with Uplily from bankruptcy schedules; and

  h. The Debtor signed transaction documents on both sides and drafted Uplily's governing documents using SWC templates to ensure his continued domination, controlling the terms to favor his interests.

 123. The Debtor intended to hinder, delay, and defraud Pack. The resulting loss to Pack was caused by the Debtor's actual fraud.

 124. Accordingly, the debt owed by the Debtor to Pack is excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

**COUNT III (FURTHER ALTERNATIVE) – NONDISCHARGEABILITY
UNDER 11 U.S.C. § 523(a)(4) (EMBEZZLEMENT)**

 125. Pack realleges and incorporates the facts pleaded above.

 126. Under 11 U.S.C. § 523(a)(4), debts arising from embezzlement are nondischargeable. Embezzlement requires: (a) property rightfully in the possession of the debtor; (b) appropriation of that property to a use other than that for which it was entrusted; and (c) circumstances indicating fraud.

 127. Beginning in January 2025, the Debtor caused Uplily to exercise operational control over the Persnickety Prints Business conducted under the Persnickety name, including control over revenues and business assets, while he remained personally obligated to Pack under the notes and Guaranty.

24

128.    The Debtor rightfully possessed business assets and operational control as the operator of Persnickety, subject to Pack's security interest.

129.    The Debtor appropriated business proceeds, revenues, and operational assets for unauthorized uses and for the benefit of Uplily—an entity in which Pack held no rights and over which the Debtor retained contractual domination—rather than preserving those assets for the benefit of the obligor entity and its creditors. Specifically: (a) beginning in January 2025, the Debtor caused revenues generated from Persnickety-branded sales to be deposited into bank accounts controlled by Uplily rather than Persnickety's accounts; (b) the Debtor transferred "all personal property" to Uplily through an exclusive insider sale for grossly inadequate consideration; (c) the Debtor moved the workforce to Uplily's payroll; and (d) the Debtor employed structures designed to suppress competitive bidding.

130.    The circumstances demonstrate fraudulent intent: the engagement of consultants to design a preplanned default-and-transfer strategy; the formation of Uplily as an undercapitalized insider vehicle with contractual provisions guaranteeing the Debtor's exclusive control and using SWC templates; the January 2025 licensing structure that began the revenue migration months before any foreclosure, contemporaneous with SBA defaults; the actual deposit of Persnickety revenues into Uplily accounts; the pattern of coordinated asset transfers to the same insider buyer using the same intermediaries; the timing of transactions in relation to Pack's default notice; the Debtor's signing on both sides and authorship of governing documents vesting final authority in himself; the Debtor's failure to notify Pack directly; the Debtor's retention of managerial control through contractual provisions that could not be overridden and receipt of compensation from Uplily; the Debtor's omission of his Manager role from bankruptcy schedules; and the Debtor's bankruptcy disclosure of a June date that predates the actual transfer, evidencing advance planning.

131.    To the extent this Court determines that the diverted proceeds and appropriated operational assets constitute property subject to embezzlement under 11 U.S.C. § 523(a)(4), the resulting debt is nondischargeable.

## COUNT IV (FURTHER ALTERNATIVE) – DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727(a)(2) AND § 727(a)(4)

132.    Pack realleges and incorporates the facts pleaded above.

133.    Under 11 U.S.C. § 727(a)(2)(A), the court shall grant the debtor a discharge unless "the debtor, with intent to hinder, delay, or defraud a creditor... has transferred, removed, destroyed, mutilated, or concealed... property of the debtor, within one year before the date of the filing of the petition."

134.    Within one year before filing his bankruptcy petition on November 21, 2025, the Debtor executed a systematic scheme to transfer from companies that he owned and controlled property of substantial value with intent to hinder, delay, and defraud Pack and other creditors holding over $5.2 million in claims.

135.    The scheme operated in two coordinated phases across the Debtor's entire portfolio of businesses.

136.    On January 2, 2025, the Debtor executed identical License Agreements within minutes of one another for Persnickety, LLC, UNDG F&P, LLC, and Sunny Lark, LLC, each granting Uplily rights to use the licensed trademarks in exchange for a 5% royalty. The Debtor signed each License Agreement on behalf of the licensor entities. Following execution, the Debtor caused net sales from all three businesses to flow directly into bank accounts controlled by Uplily rather than the entities obligated to creditors, with Uplily retaining 95% of net sales while the obligor entities remained responsible for 100% of debt service. This revenue diversion stripped

the obligor entities of cash flow, ensured their default, and prevented creditor recovery while enriching Uplily—the entity the Debtor controlled.

137.    After the License Agreements had diverted cash for months and stripped the obligor entities of operational capacity, the Debtor caused the entities to transfer substantially all remaining assets to Uplily at liquidation prices: UNDG F&P for approximately $69,000 on June 2, 2025; Sunny Lark for approximately $31,000 on June 2, 2025; and Persnickety for $115,000 in July 2025. By the time of these "sales," the businesses had already been operating under Uplily's control and generating revenue for Uplily for months. The sales merely formalized legal title to businesses Uplily was already operating and monetizing.

138.    The Debtor employed the same scheme for a real estate asset transferred to HoldingCo, LLC, another entity the Debtor formed and controlled as part of the SWC scheme.

139.    The License Agreements were critical to the fraudulent scheme. They enabled the Debtor to begin siphoning cash and operational control to Uplily six months before any foreclosure, contemporaneous with the portfolio-wide defaults across the Debtor's SBA-financed businesses. The 95%/5% net sales split ensured that obligor entities could not service their debt while Uplily accumulated the businesses' cash flow. When assets were eventually "sold" at liquidation values, creditors recovered little to nothing because: (i) the businesses had been stripped of cash flow for months; (ii) Uplily already operated the businesses and needed only legal title; and (iii) exclusive dealing with an insider eliminated any competitive bidding.

140.    These transfers were made to Uplily and HoldingCo—entities the Debtor formed and controlled, which were nominally owned by his employee, Voyles. The Debtor executed License Agreements and asset transfer documents on behalf of the selling entities while simultaneously controlling the acquiring entities as Manager under Operating Agreements the

Debtor authored. The transfers were self-dealing transactions in which the Debtor negotiated with himself, set the terms himself, diverted revenues to himself, and transferred assets from entities he controlled to other entities he controlled, all while using nominal members (Voyles contributed only $1,000 to Uplily) to create the false appearance of third-party transactions.

141.    The Debtor's intent to defraud is established by numerous badges of fraud: (a) transfers to insider entities the Debtor formed and controlled; (b) retention of control and ongoing compensation from Uplily post-transfer; (c) concealment of his Manager role in bankruptcy schedules; (d) transfer of substantially all assets and revenues of multiple going-concern businesses; (e) Debtor's insolvency with over $5.2 million in personally guaranteed obligations; (f) transfers occurring contemporaneously with portfolio-wide defaults and one day after Pack's Notice of Default; (g) grossly inadequate consideration for asset sales following months of revenue diversion; (h) systematic pattern using identical License Agreements executed within minutes of one another and coordinated asset transfers to the same insider buyers using the same intermediaries; (i) advance planning through engagement of consultants in July 2024 whose agreement memorialized the "independent decision to default" and tasked them with designing the asset-sale strategy; (j) 90-day exclusivity eliminating competitive bidding; (k) Debtor controlling both sides of every transaction and signing documents on behalf of both licensor/seller and—through his managerial control—directing the licensee/buyer; and (l) failure to notify Pack or other creditors directly of the revenue diversions or transfers.

142.    The Debtor's conduct was a carefully orchestrated scheme to preserve business assets, revenues, and income streams for himself while shedding over $5.2 million in creditor claims through bankruptcy. The systematic execution of identical License Agreements across multiple entities on the same day, followed by coordinated asset sales to the same insider buyers,

demonstrates the deliberate and fraudulent nature of the scheme. The Debtor's discharge should be denied under § 727(a)(2)(A).

143.    Under 11 U.S.C. § 727(a)(4)(A), discharge shall be denied if "the debtor knowingly and fraudulently, in or in connection with the case... made a false oath or account."

144.    The Debtor knowingly and fraudulently omitted material information from his bankruptcy schedules by failing to disclose his ongoing roles as Manager of Uplily, LLC and HoldingCo—the entities to which he transferred business assets and revenues worth millions of dollars and from which he receives ongoing compensation.

145.    This omission is material because: (a) the Manager roles carry exclusive authority over the entities' operations, finances, and assets under Operating Agreements the Debtor drafted; (b) these entities hold the businesses and revenues the Debtor diverted from entities obligated on over $5.2 million in guaranteed debt; (c) the Debtor receives compensation from Uplily; (d) disclosure would have mandated investigation of the License Agreements, revenue diversions, asset transfers, and the Debtor's retained interests; and (e) the omission concealed the Debtor's ongoing control over and benefit from assets and revenues he allegedly transferred away.

146.    The false oath was knowing and fraudulent. The Debtor testified at his Rule 2004 examination that he remained Uplily's Manager from September 2024 through his bankruptcy filing and that his petition "should be amended" to disclose his Manager roles in both Uplily and HoldingCo. This acknowledgment proves the Debtor knew of the omissions when he filed.

147.    Additionally, the Debtor's Statement of Financial Affairs falsely stated that various operating businesses' operations "ceased" and assets were "sold off" when in fact the License Agreement had already diverted their net sales to Uplily beginning January 2, 2025, and the businesses' operations continued without interruption under Uplily's control. Both the revenue

diversion and the actual transfer indicate deliberate misstatements designed to obscure the timing and scope of the Debtor's scheme.

148.    The Debtor's false oaths warrant denial of discharge under § 727(a)(4)(A).

149.    Based on the foregoing, Pack requests that this Court deny the Debtor a discharge under 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A).

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Chari Pack and Chari Ventures, LLC respectfully request that this Court:

A.   Determine and declare that the debts owed by the Debtor to Pack arising from the $300,000 Promissory Note, the $272,000 Standby Promissory Note, the Unconditional Guaranty, and related transaction documents are excepted from discharge under 11 U.S.C. § 523(a)(6), or in the alternative under 11 U.S.C. § 523(a)(2)(A), and in the further alternative under 11 U.S.C. § 523(a)(4);

B.   Enter judgment in favor of Plaintiffs and against the Debtor for all amounts due under the notes, Guaranty, and related agreements, including principal, accrued and continuing interest through the date of judgment, late fees, costs, and attorneys' fees, in an amount no less than $539,603.05 as reflected in the Debtor's bankruptcy schedules, plus such additional amounts as may be proven at trial;

C.   Award Plaintiffs pre-judgment and post-judgment interest at the rate provided in the notes and Guaranty or, in the alternative, at the federal judgment rate pursuant to 28 U.S.C. § 1961;

D.   Award Plaintiffs reasonable attorneys' fees and costs incurred in this adversary proceeding to the extent provided by the notes, Guaranty, or applicable law;

E.  As alternative relief, enter a declaratory judgment determining the amount, validity, and extent of Pack's claim against the Debtor's bankruptcy estate;

F.  Deny the Debtor a discharge under 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A); and

G.  Grant such other and further relief as the Court deems just and proper.

Dated: January 26, 2026                          Respectfully submitted,

                                                 /s/ S. Wallace Dunwoody
                                                 Jenny L. Martinez
                                                 Texas Bar No. 24013109
                                                 jmartinez@munckwilson.com
                                                 S. Wallace Dunwoody
                                                 Texas Bar No. 24040838
                                                 wdunwoody@munckwilson.com
                                                 Taylor J. Grover
                                                 Texas Bar No. 24149650
                                                 tgrover@munckwilson.com
                                                 **MUNCK WILSON MANDALA, LLP**
                                                 1900 Texas Capital Center
                                                 2000 McKinney Avenue
                                                 Dallas, Texas 75201
                                                 972-628-3600
                                                 972-628-3616 Fax

                                                 *Attorneys for Plaintiffs*
                                                 *CHARI PACK and CHARI VENTURES, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2026, a true and correct copy of the foregoing Complaint to Determine Dischargeability of Debt was served electronically via the Court's CM/ECF system on all counsel of record and all other parties entitled to service in accordance with the Federal Rules of Bankruptcy Procedure.

                                                 /s/ S. Wallace Dunwoody
                                                 S. Wallace Dunwoody