## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re: JOSEPH J. TERNDRUP <br>                Debtor | Case No. 25-44558-elm7 <br><br> **Chapter 7** |
| **CHARLI PACK and** <br> **CHARLI VENTURES, LLC,** <br>                Plaintiffs <br> **v.** | **Adversary No. 26-04004-elm** |
| **JOSEPH J. TERNDRUP,** <br>                Defendant | |

### DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT

Defendant, Joseph J. Terndrup ("Defendant"), by and through undersigned counsel, files this Answer to Plaintiffs' Complaint ("Plaintiffs"), and respectfully shows the Court as follows:

### I. GENERAL DENIAL

Pursuant to Fed. R. Civ. P. 8(b), made applicable by Fed. R. Bankr. P. 7008, Defendant denies each and every material allegation contained in Plaintiffs' Complaint, except those expressly admitted herein.

### II. SPECIFIC ADMISSIONS AND DENIALS

1. Defendant denies participating in a pre-planned scheme migrating operational control, revenue streams, and legal title of a going-concern business to an insider entity while eliminating recovery for Plaintiffs.

2. Defendant admits Plaintiffs' sale of the Persnickety Prints Business to Debtor in June 2023, Plaintiffs held two seller-financing promissory notes totaling $572,000, a security interest in business assets, and the personal guaranty from Defendant is "absolute and unconditional".

3. Defendant denies destroying Plaintiffs' recovery rights and rendering the personal guaranty uncollectible. Defendant denies diverting revenue to Uplily, LLC ("Uplily") while retaining debt

to Persnickety Prints, LLC ("Persnickety, LLC"). Defendant denies that Persnickety Prints Business was sold for a fraction of its value, but admits it was sold in July 2025, and denies the sale was to an insider entity that Defendant controlled. Defendant admits receiving compensation for his services from Uplily. Defendant denies that the sale merely formalized legal title to a business the insider entity had already been operating and monetizing for six months.

4.       Defendant denies that the alleged "resulting deficiency" is a direct consequence of alleged revenue diversion, operational migration, and insider transfer at inadequate consideration to preserve the Persnickety Prints Business for Defendant's benefit while ensuring Plaintiffs recovered nothing. The assets were sold by the primary secured party, Veritex Community Bank, in a public auction after a desktop appraisal. For that sale, for Plaintiffs to receive anything, the small business administration ("SBA") note would have needed to be paid off first. Alternatively, other SBA banks initiated commercially reasonable Article 9 sales. The SBA banks sold the assets for what they considered, based on third-party appraisals, to be a reasonable value.

5.       Defendant admits that Plaintiff is seeking a determination that the alleged debts owed under the notes and guaranty are not dischargeable under 11 U.S.C. § 523(a)(6), or alternatively, § 523(a)(2)(A), or in the further alternative § 523(a)(4). Defendant admits that Plaintiff is requesting this Court deny the Defendant discharge under 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A). Defendant denies any willfully or maliciously conduct, or actual fraud, or participation in asset-transfer schemes recognized in *Husky Int'l Elecs., Inc. v. Ritz,* 578 U.S. 356 (2016), or any broader fraudulent transfer scheme relating to the bankruptcy petition. Defendant denies that any omissions in the bankruptcy petition were intentional. Defendant immediately shared all information upon first request from the trustee without trying to hide anything. When the error was discovered, an amendment was filed to resolve the unintentional omission.

6.      Admit.

7.      Admit.

8.      Admit.

9.      Admit.

10.      Admit.

11.      Admit.

12.      Admit.

13.      Admit.

14.      Admit.

15.      Deny. The transaction did not include "goodwill".

16.      Admit.

17.      Admit.

18.      Admit as to types of closing documents. Deny as to any characterization that Plaintiffs' notes cannot be discharged.

19.      Admit as to text of guaranty. Deny as to any characterization that Plaintiffs' notes cannot be discharged.

20.      Deny as to amounts of online sales and customer orders for 2024 and 2025. Defendant denies any fraudulent diversion of Persnickety Prints Business's online sales to Uplily.

21.      Admit.

22.      Admit, but denies being an expert, denies "touting the success of the businesses", and denies that the advice was primarily about "the passive income streams he created". Passive income streams were generally connected to structures investors could create which were different but similar to how he invested as an owner-operator. The Defendant did on occasion discuss

specific passive income streams that he created that were limited to the time period referenced in the articles since an owner-operator business can repeatedly move between passive and active management depending on the performance of the business, whereas a passive investor does not deal with a similar issue. Defendant only shared lessons, positive and negative, regarding the good years of the businesses.

23.    Admit.

24.    Admit

25.    Defendant denies any motive to implement a structure that would transfer operational control and legal title to an insider entity, preserving the Persnickety Prints Business and the other businesses for the Defendant's benefit while shedding acquisition debt and personal liability on guaranties.

26.    Deny. Passive income streams were generally connected to structures investors could create which were different but similar to how he invested as an owner-operator. The Defendant did on occasion discuss specific passive income streams that he created that were limited to the time referenced in the articles since an owner-operator business can repeatedly move between passive and active management depending on the performance of the business, whereas a passive investor does not deal with a similar issue. Defendant only shared lessons, positive and negative, regarding the good years of the businesses.

27.    Admit.

28.    Admit text of agreement. Defendant denies any characterization of fraud. The relationship between SWC and Defendant started with SWC doing an analysis phase where all debts and revenues were looked at in depth to determine insolvency and decide which path forward. Deny that their sole purpose was to memorialize an "independent decision to default". The consultants

began with an in-depth independent analysis of the situation for each company and came to the understanding that the companies were insolvent. Then they engaged in conversations with the various SBA banks, and all parties to gradually work-out each next step based on the facts of the situation. Each business situation was complicated, and no clear path was known from the beginning. The SBA banks each controlled the final outcome by seizing and selling the assets of the business that collateralized their loans. Deny that the consultants performed asset-sale transactions since the primary lender Veritex Community Bank negotiated the terms and sold the assets. Defendant denies any of this was intended to negatively affect Plaintiff's debt.

29. Defendant denies any characterization of fraud or targeting debts. The relationship between SWC and Defendant started with SWC doing an analysis phase where all debts and revenues were looked at in depth to determine insolvency and decide which path forward. The consultants began with an in-depth independent analysis of the situation for each company and came to the understanding that the companies were insolvent. Then they engaged in conversations with the various SBA banks and all parties to gradually work-out each next step based on the facts of the situation. Each business situation was complicated, and no clear path was known from the beginning. The SBA banks each controlled the final outcome by seizing and selling the assets of the business that collateralized their loans. Deny that the consultants performed asset-sale transactions since the primary lender Veritex Community Bank negotiated the terms and sold the assets. Defendant denies any of this was intended to negatively affect Plaintiffs' debt.

30. Admit as to power of attorney. Deny as to the parties renegotiated a contract with a different amount. A total of ~$177,017.00 was paid to SWC in total. The initial total was to be $185,000.00.

31. Deny. The second engagement did not add an additional $167,000 but took up where the previous contract had been stopped in payments. SWC recalculated a new contract and new

payment schedule. The total approximate cost amount across both contracts was ~$177,017.00.

32.    Defendant denies that the SWC engagements document advanced fraudulent planning to default on portfolio obligations, including Plaintiff's debt. Defendant denies any fraudulent coordinated asset-sales transactions. The businesses were insolvent, confirmed by Defendant and SWC, due to ecommerce decline and market conditions created by COVID in 2022-2024, and other market conditions. Defendant attempted to sell the companies with a broker, but the Defendant was never told about any bids from the broker, then since the businesses were insolvent and could not afford bank payments, the banks sought to sell the assets. SWC was in negotiations the whole time with the SBA banks prior to the broker. The SBA banks told SWC what they needed (attempt to sell), and SWC and Defendant were responding to the SBA banks to give them what they wanted.

33.    Admit.

34.    Defendant admits that Aren Voyles is managing member of Uplily with stated capital contribution of $1,000. Defendant admits he was designated as a manager of Uplily; however, he had to consent to and approve of major decisions by the Members. Additionally, the manager could be terminated by the Members at any time.

35.    Admit.

36.    Admit as to Voyles contributions, but Defendant denies that no additional capital was ever contributed to Uplily beyond Voyles initial contribution. Working capital was earned through license agreements, and a Dune loan was used to purchase the assets.

37.    Defendant denies authoring the Operating Agreement but admits he loaded the document for electronic signature and was the first signatory. The Operating Agreement was provided to the Defendant and Aren Voyles by Second Wind Consultants, Inc. ("SWC") as a template with fill in

the blanks.

38.    Defendant admits SWC prepared Uplily's formation documents and performed required filings. Defendant admits uploading the Operating Agreement and that it originated from SWC templates. Defendant denies any "scheme planned and approved by Debtor". By the time Uplily was formed, the end was still unclear, as it depended on negotiations with the banks, complete analysis of all entities by SWC. The Defendant surrendered assets to the SBA banks, and the SBA banks decided to sell all the assets utilizing a public auction or Article 9 sales. All negotiations were handled by SWC.

39.    Deny, SWC did the search, interviewed lenders, and negotiated the terms and final loan with Dune. Uplily later took over the contract with an assumption agreement with SWC and worked with them after Persnickety LLC shut down operations.

40.    Deny. The businesses were insolvent due to market conditions and had exhausted the bank's alternative solutions (interest only loan modification) to delay asset seizure. The banks and SWC handled the negotiations for how to most cleanly handle the seizure and sale of the assets. Ultimately, the bank decided to seize the assets and sell using a public auction that was advertised publicly. Uplily made a bid on the assets that was ultimately accepted based on the Bank's appraisal and fair estimate of the assets.

41.    Defendant denies that Defendant had exclusive operational and transactional control in Uplily, LLC.

42.    Deny. Major decisions were only allowed to be consented to by the Manager. The Member could terminate and hire a Manager. Ultimately, major decisions required Member approval.

43.    Defendant admits in the sense that he was employed as a manager of the company to effectuate its operations, Defendant denies any characterization he was a managing member of the

company or had any ownership interest in the company. Defendant denies that he had full authority and control of the company since Major Decisions required Member's approval (Managers must consent and approve of Member's Major Decisions) and the Member could terminate the Defendant at the Member's discretion. This left the ultimate control with the Member.

44.    Defendant denies that Defendant had structural control that "could not be overridden" by the Members since Managers had to consent to and approve Member's Major Decisions and Defendant denies any characterization that this authority was unlimited as the Members could terminate Defendant as Manager. Defendant admits the unilateral authority to designate additional Managers, and such Managers could bind the company, and any disagreements between Managers would be decided by Defendant. Defendant denies any characterization that the Mangers authority in the company was unlimited as the Members were able to terminate the Managers and were required to consent to Member's Major Decisions.

45.    Deny. Defendant denies such control was unlimited as the Members could terminate the Managers. The Member had joint administrative control of bank accounts, all bank accounts were set up in the Member's name giving him control with the bank to close accounts, open accounts, move money, or handle any transactions within the bank accounts. Managers had to consent and approve of Member's Major Decisions.

46.    Deny. Defendant denies since Managers had to consent to and approve of Member's Major Decisions. Managers must consent to and approve Major Decisions made by the members. Furthermore, Defendant denies such control since the Members could terminate the Managers.

47.    Deny.  The Defendant was required to consent to and approve of Major Decisions made by the Members, and the Members can terminate the Manager. The Manager certainly could not unilaterally change Members' shares (unless the Members sought it via Major Decision section)

since that would be theft and the Manager carries a fiduciary responsibility to the Members.

48.     Defendant denies that Uplily was an insider entity contractually dominated by Defendant because the Members could terminate the Manager and Manager could not perform Major Decisions without approval of the Members. Defendant admits that the operating agreement enables him to receive compensation and control transferred business operations but denies preserving economic benefits of the Persnickety Prints Business while shedding personal guaranty liability. Defendant again denies any control over compensation and control of transferred business operations was not unlimited as the Members could terminate the Manager and the Member was required to consent to and approve Major Decisions.

49.     Defendant denies participating in or the existence of any "SWC scheme". Defendant admits the portfolio entities began defaulting on their SBA loan obligations in 2024 due to the businesses being insolvent and not being able to pay the SBA loan obligations. For example, on the Defendant's 2024 taxes, Form 8995, the total business losses were -$561,131 with Persnickety LLC's income losses at -$207,701.

50.     Defendant denies participating in or the existence of any "SWC scheme". Defendant admits that trademark license agreements were executed on January 2, 2025: (i) Persnickety, LLC to Uplily; (ii) UNDG F&P, LLC to Uplily; and (iii) Sunny Lark, LLC to Uplily. These license agreements occurred after two years of significant losses for the portfolio and after proven insolvency first with SWC and later with the SBA banks. Defendant's taxes, form 8995, show the total business losses were -$561,131 in 2024 with Persnickety LLC's income losses at -$207,701 prior to any license agreements being signed. Veritex Community Bank requested that Persnickety LLC sell the assets due to Persnickety LLC's insolvency and default on its loan obligations. Upon the advice of SWC and with Veritex Community Bank's affirmation, Persnickety LLC first listed

the assets for sale with a business broker, and the Defendant did not receive any offers from the broker. At the advice of SWC, the portfolio gradually shut down all operations after two years of insolvency using the license agreements to benefit the creditors and gain a royalty on the operation of the licensed property even while the portfolio entities were shutting down operations. This allowed the primary secured party to determine how best to dispose of the assets, as well as to have sufficient time to accomplish this objective, obtain appraisals, seize the assets, and conduct public auctions or sales at their appraised market value in order to maximize the recovery value for the assets, including the assets of Persnickety LLC. All of this was to the primary secured party's benefit since an immediate shut down of the businesses without these license agreements would have led to a degradation of the assets, and the determination of the landlord as to how to dispose of the assets due to leases not being paid while Veritex Community Bank would be under pressure to sell at an accelerated timeline.

51.     Admit. Additional expenses had to also be paid as well as cost of goods sold should any of the original entities inventory be sold off or other expenses incurred.

52.     Deny. The license agreements were created by SWC and were templates provided to the Debtor.

53.     Defendant admits that the license agreements were executed approximately six months before the July 2025 transfer of legal title. However, Defendant denies that the agreements pre-positioned Uplily to operate the portfolio businesses and siphon off net sales revenues using the sham license in advance of any foreclosure. When the execution happened, Defendant and SWC were uncertain when the sale of the assets would occur and believed it could be within 0-3 months. The operations were being wrapped up, while maintaining a situation beneficial to the primary secured party allowing them to sell off the assets and get through all their requirements for a public

auction. The primary secured party's process resulted in the additional months of operations under the license agreement, which SWC and Defendant did not anticipate. Additionally, multiple loan modifications were executed between October 2024 and July 2025.

54.     Defendant denies that Uplily began operating the Persnickety Prints Business, but admits to using the licensed trademarks, domain names, e-commerce platforms, and associated access credentials when manufacturing, marketing, and distributing licensed products in North America according to the non-exclusive licensing agreements.

55.     Defendant admits that Uplily's Persnickety Prints Business- branded sales were deposited directly into its bank accounts while retaining sales minus expense compensation, minus a 5% license fee, for manufacturing, marketing, and distributing licensed products for its non-exclusive license with Persnickety LLC and giving 5% of the royalties plus expense compensation back to Persnickety LLC accordingly. Defendant denies Persnickety LLC remained obligated for 100% of debt service. Uplily bought its own inventory, materials, and paid back contractual expenses if any were incurred under the license agreements with the respective nonexclusive license agreement intellectual property and sold it under the license agreement terms.

56.     Admit assuming 5% of sales plus an allocation for pay-back of additional limited expenses.

57.     Defendant denies that the licensing structure simply diverted 95% of net sales to Uplily while Persnickety LLC remained obligated to service 100% of its debt to Veritex Community Bank and to Plaintiffs, because due to the agreement, Persnickety LLC did not have to pay additional costs of manufacturing, marketing, and distributing licensed products in North America. Uplily bought its own inventory and material to sell under the nonexclusive license agreement. Defendant denies that the licensing structure contributed to any impairment of Persnickety LLC's ability to meet payment obligations under the Veritex Community Bank loan and Plaintiffs' notes, which

were already proven to be insolvent and in default from January – February 2024, although a second loan modification was negotiated and signed at the end of February covering Jan 2024 – March 2024, the license agreement had been put in place in January thinking that the asset sale was imminent due to the end of the first loan modification period and inability to pay the full loan payments. Although a second loan modification was later negotiated at the end of February 2024, Persnickety LLC had no way to pay the full loan payment once the loan modification ended. The license agreements were for the benefit of the SBA banks as they allowed time for the primary secured party to process the asset sale and obtain the full price of the assets. The SBA bank would have been more likely to receive less if under pressure due to a hard, immediate shutdown of the businesses. License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party allowing them time for a full price orderly sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and is not questioning the discharge of the debt in bankruptcy.

58.    Defendant denies any "revenue diversion". Defendant denies that employees were "moved" from Persnickety LLC's day-to-day operations to Uplily's payroll. Defendant admits that Persnickety LLC no longer had a separate workforce and no longer had to pay payroll to employees by the end of the first quarter of 2025. Defendant denies that Persnickety LCC had core functions (or had need for such functions) such as sales, order fulfillment, customer service, or marketing

because such activities were delegated to a different company. Defendant denies any characterizations of this business decision as "usurping". There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. The Defendant shut down operations in a way that benefited the primary secured party.

59. Defendant denies "draining all cash out of Persnickety, including by paying himself a salary without performing any work for the business". The debtor wrapped up the final obligations of Persnickety LLC and shut down operations in accordance with a method that benefited the primary secured party while SWC negotiated the details of the final sale of the assets. All cash of the business was spent on legitimate business expenses. The owner took a market wage for his role in Persnickety LLC which consisted of significant responsibilities. Although in the immediate year after acquiring Persnickety Prints Business, the Defendant worked only approximately 5-10 hours per week on Persnickety LLC mainly in marketing and executive oversight. Starting early in 2024, Persnickety LLC became a primary focus of his due to the sustained losses and decreased profitability. He worked a considerable amount of time in the business including in marketing, in executive oversight, in legal support, and in managing all aspects of the business throughout 2024 to try and save the business from needing to default.

60. Defendant denies the licensing agreements were a sham and instead were set up for the benefit of the primary secured party to allow for the sale of the assets on the terms set by Veritex Community Bank. Defendant denies diverting revenue into Uplily's bank accounts. Persnickety LLC, after proving insolvency, shut down its operations in anticipation of the sale of its assets by the SBA bank. Defendant denies simply transferring the workforce. Defendant admits to being compensated by Uplily. Defendant denies stripping Persnickety LLC of its revenue-generating capacity and operational infrastructure. The Defendant shut down operations of the insolvent

portfolio in accordance with advice from SWC in a manner that allowed the primary secured party to complete the sale of their assets, obtain market appraisals to establish accurate market prices, and obtain the highest price for its seized assets. Defendant denies Persnickety LLC was a shell entity or intended it to be so by the July 2025 foreclosure. The primary secured party, Veritex Community Bank, sold off the assets of Persnickety LLC for a price acceptable to them after an appraisal was completed by them. Defendant denies any characterization that the "migration" was a plan to make Persnickety LLC a shell entity by the time of the foreclosure and any "sale" would transfer legal title to a business Uplily which had already been operating and monetizing for six months. The sale was carried out in a public auction by the primary secured party, Veritex Community Bank, for their benefit with prices set according to their determination and their appraisal of the assets.. Defendant denies that the "migration" directly caused the destruction of Plaintiffs' recovery rights. Instead, the Defendant asserts that Veritex Community Bank sold the assets at what they determined to be a fair price after appraisals, and the Defendant's actions allowed Veritex Community Bank to complete their process to receive maximum benefit for them as the primary secured party, which in turn would benefit Plaintiffs if there were to be surplus from the sale. Defendant admits that Persnickety LLC could not generate cash flow to satisfy Plaintiffs' notes. Defendant denies the subsequent sale was to an insider entity for a fraction of its value due to appraisals of the assets being ordered and received by Veritex Community Bank, and Veritex Community Bank set a value for the assets based on their appraisal that they deemed to be a fair price while also holding a public auction and ultimately carrying out a sale of the assets for the benefit of the primary secured party. Defendant admits that Plaintiffs were left nothing since the primary secured party, Veritex Community Bank, sold the assets of Persnickety LLC at public auction and retaining its proceeds.

61.     Deny. Pinnacle Financial Partners bank sold off the assets of UNDG F&P LLC and Sunny Lark LLC according to what Pinnacle thought was a fair price according to its appraisals of the assets. UNDG F&P LLC and Sunny Lark LLC surrendered their assets to Pinnacle Financial Partners in accordance with their agreement, which stated: "Subject to the terms and conditions of this Agreement, Company [Sunny Lark LLC and UNDG F&P LLC respectively] will surrender directly to Lender [Pinnacle Financial Partners], simultaneously with Lender selling directly to Purchaser". Admit that the final transaction occurred on June 2, 2025, for the stated amounts.

62.     Deny. Pinnacle Financial Partners executed the sale since they were the seller. Uplily was the Buyer with Aren Voyles as the signatory. Sunny Lark LLC and UNDG F&P LLC surrendered assets to Pinnacle Financial Partners with the Defendant as the signatory.

63.     After a reasonable inquiry, Defendant is unaware of what association Todrin Law Group has with the parties in question and cannot say if they are associated with SWC or Pinnacle Financial Partners. For such reasons, deny.

64.     Admit that these transactions occurred on June 2, 2025. Defendant denies that Uplily is an insider. Defendant admits the transaction transferred "all assets", but denies it was at compressed pricing. Appraisals were made on the assets by Pinnacle Financial Partners and by Defendant. Pinnacle Financial Partners sold the assets for a price they thought was a reasonable price based on their appraisals obtained. Defendant admits the same intermediaries were used in the Persnickety LLC sale. Defendant denies any "pattern" to be "replicated" in the Persnickety LLC sale since the transfers were unique to the SBA banks involved who determined how they would dispose of the assets. All transactions were performed for the benefit of the primary secured party, the SBA bank, and carried out by the primary secured party, whether Veritex Community Bank for Persnickety LLC or Pinnacle Financial Partners, for Sunny Lark LLC and UNDG F&P LLC.

65. Deny. By 2024, Persnickety LLC had defaulted on payment obligations under the Veritex Community Bank loan. These defaults were negotiated into loan modifications due to the insolvency of Persnickety LLC in 2024. The first loan modification occurred on October 5, 2024.

66. Admit.

67. Admit.

68. Defendant denies that he kept "truth of his scheme a secret", or that there was a scheme or a secret by the foreclosure proceeding. Defendant was not required to notify Plaintiffs of the foreclosure process as the responsibility for that is the senior secured party. Defendant denies any characterization that Defendant purposefully withheld information regarding the foreclosure from Plaintiffs.

69. Defendant admits that Veritex Community Bank issued a "Notification of Disposition of Collateral" stating that a public sale of collateral would be held on July 25, 2025, at the offices of Todrin Law Group in Dallas, Texas. After a reasonable inquiry, Defendant does not know whether Plaintiffs received notice of the sale until after it occurred, therefore Defendant denies.

70. Deny. After a reasonable inquiry, Defendant does not have any knowledge whether Plaintiffs received notice of the sale nor what was in the notice, therefore Defendant denies.

71. Admit as to the location of the property and the notifications directions. After a reasonable inquiry, Defendant does not have any knowledge whether Plaintiffs received notice of the sale until after it occurred, therefore Defendant denies. Defendant denies any "design" that Veritex Community Bank did not provide notice on purpose. Defendant denies contributing to any alleged "design" to not give Plaintiffs notice of the sale. Defendant denies Uplily as an insider buyer as it was a public sale. Defendant denies controlling Uplily or that it was "in possession of an operating the Persnickety Prints Business and siphoning off its net sales and cash with the sham license

agreement." Defendant denies that the "plan had been in place for nearly a year." Defendant denies having any control or influence over Veritex Community Bank.

72.     Deny. The advertisement was written and published by Veritex Community Bank's attorney (Laura L. Worsham), and clearly states general intangibles are included in the auction:

> "all of Debtor's presently owned and existing and hereafter acquired and arising Accounts, Inventory, Equipment, Furniture, Fixtures, other Tangible Property, General Intangibles, Chattel Paper, Instruments, Deposit Accounts and Other Property, including, but not limited to its interest in the property described in Exhibit "A" attached hereto, to the highest qualified bidder for cash…".

The defendant further denies that the intangible assets comprise the majority of the Persnickety Prints Business going-concern value. The Veritex Community Bank, with input from an independent appraisal, determined the reasonable value for the assets and decided on the final sale price. Furthermore, it would be incorrect to suggest otherwise since the Persnickety LLC original purchase of assets from Plaintiffs was largely goodwill, that the goodwill means that the intellectual property of the Persnickety Prints Business is valued at that price. This business specifically was originally valued off a set multiple of Cash Flow plus Seller's discretionary pay called Seller's Discretionary Earnings. This means even a business with no or low sellable intellectual property that simply has cash flow similar to that of Persnickety LLC would get a similar valuation. The price that is not directly associated with inventory and furniture, fixtures, and equipment get assigned to goodwill for accurate tax accounting having no bearing on the value of any intellectual property, simply the cash flow multiple earned by the business beyond the direct price of the physical assets.

73.     Admit, however, Defendant denies that the two events are connected. The sale had been negotiated and worked on for a considerable amount of time and happened to land on that date. Additionally, Defendant was not involved in setting dates or details as he relied on Veritex

Community Bank and SWC, which worked out such details.

74.     Deny. The exclusivity only came after the public auction, appraisal ordered by Veritex, and then Uplily being the highest bidder at the auction.

75.     Defendant admits that he released assets to Veritex Community Bank for public auction and signed on behalf of Persnickety LLC as "Manager/Owner" but denies that he signed any transaction documents on both sides of the sale. Defendant admits Voyles signed on behalf of Uplily as "Member". Defendant denies that there was a fully executed Secured Party Sales Agreement dated July 18, 2025, since the only version the Defendant discovered is a draft version without the final signature of all parties, including Veritex Community Bank, and thus ineffective.

76.     Admit.

77.     Defendant denies. The July 15 Notice specifically lists "General Intangibles" within the Notice. Defendant was not involved in making the July 15, 2025, notification. Defendant admits that there was a July 28, 2025, private sale agreement after the public auction but denies the existence of a fully executed July 18 private sale agreement. The Defendant admits there was a July 18 Private Sale Agreement draft that was created by SWC and Veritex Community Bank during discussions that was never signed by all parties or executed by Veritex Community Bank. The July 28 bill of sale agreement conveys all personal property including intangibles. Defendant denies the 90-day exclusivity provision eliminated any competitive process or market test of value since the competitive process in the form of a public auction had taken place prior to the sale of the assets on July 25, 2025.

78.     Admit.

79.     Deny. Veritex Community Bank seized the assets and sold them to Uplily after public auction.

80.    Admit.

81.    Defendant admits that Plaintiffs were not a party to the Voluntary Surrender Agreement. After a reasonable inquiry, Defendant does not have knowledge whether Plaintiffs waived their rights, therefore Defendant denies. Defendant denies that the secured lender's foreclosure process is context for timing, structure, and exclusivity of any alleged insider transfer. Defendant denies that it was an insider transfer. Defendant denies knowledge or intent that Plaintiffs would recover nothing.

82.    Admit.

83.    Admit.

84.    Defendant admits that contractors working on behalf of Uplily submitted the trademark filings by mistake to the USPTO after the UNDG F&P LLC and Sunny Lark LLC asset sales had closed on June 2, 2025. The trademarks that should have been transferred were the trademarks related to those transactions that had occurred. The Defendant admits that the contractors who accomplished this signed his name and he did not catch the mistake. Defendant testified in his Rule 2004 that he believed he signed those, but after reviewing afterward, Defendant does not believe he signed those. Defendant did not mean for those to be transferred, and any transfer was a mistake or unintentional. Due to the large number of trademarks that needed to be transferred this mistake went unnoticed by the Defendant and Veritex Community Bank. Defendant denies that the transfers demonstrates that intellectual property consolidation in Uplily was planned and executed in advance of any foreclosure and denies that it corroborates alleged advance planning reflected in the SWC agreements and the January 2025 License Agreements.

85.    Deny Plaintiff's characterization of "the July 2025 transfer". The assets of the Persnickety LLC were purchased by Uplily at public auction, which was a merger of the assets and locations

of multiple businesses. The business did operate under the "Persnickety Prints" brand, using the same e-commerce platform, website, domain name, customer lists, and vendor relationships, despite many operational processes changing.

86.     Deny characterization of "the transfer of legal title to Uplily merely formalized ownership of a business that Uplily had been operating and monetizing since January 2025 through the licensing structure and operational migration." Defendant denies that the license agreements were revenue diversion and operational migration, as the License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party allowing them time for a full price orderly sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and are not questioning the discharge of the debt in bankruptcy.

87.     Admit.

88.     Admit as to remaining Uplily's Manager and compensation,

89.     Defendant admits that he always remained Uplily's Manager following the formation of the company and through his filing of his bankruptcy petition. Defendant admits that he retained authority over Uplily's day-to-day operations as Manager and received compensation from Uplily but denies any allegations that he "transferred" the Persnickety Prints Business operations. Additionally, Defendant denies unlimited control over Uplily's day-to-day operations as Major

Decisions were made by Members, and he could be terminated by the Members.

90.     Admit the contents of the letter from the landlord. However, Defendant denies alleged hearsay testimony by a landlord is evidence of continuity of business operations. Any merger reference from the Defendant did not refer to the old entity that was shutting down and the new entity, but instead the acquisition of the assets of multiple entities (UNDG F&P LLC, Persnickety LLC (through public auction), and Sunny Lark LLC) and bringing them into a single entity. The Defendant denies ever stating that the old entity and the new entity would be merging.

91.     Deny. The Defendant denies that the intellectual property of Persnickety LLC, an insolvent entity with an appraised valuation, is valuable beyond the stated purchase price and appraised asset value under the conditions its assets were sold under. Deny that the Persnickety Prints Business was generating at least $1.8 million

92.     Admit.

93.     Admit that $115,000 is a lower amount than $2.7 million. Deny that $115,000 price represents approximately 6 to 7 percent of annual revenue and approximates the liquidation value of tangible equipment.

94.     Admit. Defendant denies any suggestion that the personal guaranty from Defendant is nondischargeable.

95.     After a reasonable inquiry, Defendant does not have any knowledge whether Plaintiffs' recovery rights depended on the preservation of Persnickety Prints Business value and cash flow and, upon any default, the enforcement of those rights through payment under the Guaranty or through the application of sale proceeds according to creditor priority, therefore Defendant denies. Defendant admits that Plaintiffs' recovery rights are subrogated to a primary secured party.

96.     Defendant denies that he destroyed Plaintiffs' recovery rights. Defendant denies any

characterization that his actions were intended to harm Plaintiffs' recovery rights. Defendant denies any "cash and net sales diversion". Defendant admits Uplily received proceeds due to the licensing agreements but did not "strip" Persnickety LLC of cash flow or ensure any defaults. Defendant denies that the July 2025 transfer was a mere transfer of legal title and denies that $115,000 represents a fraction of going-concern value and did not occur through an exclusive insider transaction that eliminated any competitive process.

97.     Defendant admits that Plaintiffs' secondary security interest was not satisfied by the proceeds paid to the primary secured party.

98.     Admit.

99.     Deny. The businesses were insolvent and the primary secured party exercised their rights to sell the assets. There was no surplus to satisfy Plaintiff's notes, and no requirement by the Defendant to operate insolvent businesses for any duration of time. Defendant denies any revenue diversion, operational migration, or insider transfer. Uplily bought the assets at public auction at a price set and accepted by the primary secured party. Defendant denies ensuring Plaintiffs recovered nothing.

100.     Admit.

101.     Admit. However, Defendant denies any characterization that mistakes in the Statement of Financial Affairs are intentional. Defendant provided all the requested documentation about all asset sales to the trustee soon after request that contained all the correct information as understood by the Defendant.

102.     Deny. A private sale agreement draft was circulated on July 18,2025 that was not signed by Veritex Community Bank since the bank's legal team decided they wanted to accomplish a public auction of the assets. The final private sale was completed on July 28, 2025.

103.     Deny. Defendant denies the transaction was a pre-planned debt avoidance scheme and not commercially reasonable. The businesses were insolvent for two years, a loan modification was executed, a broker was hired to sell the business (to no avail), and then the primary secured party exercised its rights to collect and sell the property. The primary secured party appraised the property, sent notice of the public auction, and then sold the property to Uplily, the highest bidder. Defendant denies that the license agreements were revenue diversion and operational migration, as the License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party allowing them time for a full price orderly sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and are not questioning the discharge of the debt in bankruptcy.

104.     Admit. Defendant denies any characterization that mistakes in the bankruptcy schedules are intentional. All documentation was provided to the trustee of his role as a manager immediately upon asking and nothing was concealed about this role. The mistake was quickly fixed when discovered in the bankruptcy schedules.

105.     Deny, as Defendant testified, the schedules should be amended to include his Manager role in Uplily and HoldingCo. Debtor immediately disclosed his Manager role to the Trustee upon a request of written questions and during the Rule 2004 meeting and did not try to hide or deceive this fact during any part of the bankruptcy inquiry. The Defendant's lawyer stated the software

employed by his firm was confusing with this question and likely caused the error.

106.    Defendant admits that Plaintiff filed suit in United States District Court for the District of Utah (Case No. 2:25-cv-00947) but denies such allegations and such claims have been adjudicated or reduced to judgment against Defendant.

107.    Admit that Plaintiff realleges and incorporates their alleged facts.

108.    Admit.

109.    Admit the standards listed of *Kawaauhau v. Geiger,* 523 U.S. 57, 61-62 (1998). Defendant denies either prong is satisfied. Defendant denies subjectively intending to eliminate Plaintiffs' recovery or orchestrating in the described scheme. Defendant denies knowing that the alleged conduct would destroy Plaintiffs' ability to recover under the notes and guaranty.

110.    Deny. Defendant denies willfully and maliciously injuring Plaintiffs through any preplanned scheme. Defendant denies fraudulently transferring legal title to an insider entity. Defendant denies intending to eliminate Plaintiffs' recovery. Due to market conditions, the portfolio became insolvent, a loan modification was executed, a broker was hired to sell Persnickety LLC (to no avail), and then the primary secured party exercised its rights to collect and sell the assets. The primary secured party appraised the property, sent notice of the public auction, and then sold the property to Uplily, the highest bidder. Defendant denies that the license agreements were revenue diversion and operational migration, as the License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party allowing them time for a full price orderly

sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and are not questioning the discharge of the debt in bankruptcy.

111.    Deny that the Defendant acted willfully, or deliberately, or intentionally, or in a way that he knew was substantially certain to destroy Plaintiffs' recovery.

    a.    Admit the Defendant engaged consultants. Deny that their sole purpose was to memorialize an "independent decision to default". The consultants began with an in-depth independent analysis of the situation for each company and came to the understanding that the companies were insolvent. Then they engaged in conversations with the various SBA banks, and all parties to gradually work-out each next step based on the facts of the situation. Each business situation was complicated, and no clear path was known from the beginning. The SBA banks each controlled the final outcome by seizing and selling the assets of the business that collateralized their loans. Deny that the consultants performed asset-sale transactions since the primary lender Veritex Community Bank negotiated the terms and sold the assets.  Defendant denies any of this was intended to negatively affect Plaintiffs' debt.

    b.    Defendant denies that Uplily was undercapitalized acquisition vehicle. Uplily had $1000 from its owner, and received an asset backed loan in the amount to purchase the assets at the bank's estimate of a reasonable value for the assets. Defendant denies nominal ownership by Voyles. Defendant admits to being Manager but denies complete control as to rise to the level of an insider because the Members could terminate the Manager and the Member can decide on Major Decisions. Defendant admits that SWC templates and advice

was used along with discussions with Aren Voyles in drafting the governing documents.

c. Defendant denies exclusive control as the Members could terminate the Manager at any time and Major Decisions are decided by the Members with consent of the Manager. The Defendant denies that the current operating agreement gives the Manager unilateral authority to bind the company, control distributions and banking, appoint or override other Managers, block ownership changes, admit Members, amend the Operating Agreement, and make all final determinations in the event of any disagreement. The current operating agreement was amended to explicitly clarify the original intent that Members and Managers vote on Major Decisions.

d. Defendant denies that the license agreements were meant to shift revenue generation and operational control to Uplily in advance of any alleged planned foreclosure. The defaults and insolvency occurred in the prior year, 2024 as shown by tax statements, loan modifications, and other documentation and determined independently by the SBA bank and SWC. Defendant admits that under the arrangement of the non-exclusive license agreement with Uplily, Persnickety LLC retained 5% of sales, but Persnickety LLC did not have to deal with overhead costs of manufacturing, marketing, and distributing licensed products in North America. In anticipation of the selling off Persnickety LLC's assets, all operations in Persnickety LLC was gradually shut down due to insolvency in the previous twelve months and earlier utilizing the mechanism of a license agreement. The Defendant is not required to continue to run insolvent businesses and he shut them down in a way to preserve the assets for the sale and benefit of the primary secured party, SBA bank Veritex Community Bank who sold the assets and determined the selling price of the assets based on their 3rd party appraisal. Requiring the Defendant to continue running an insolvent

business against his will would be equivalent to indenture or slavery which is illegal under the United States Constitution.

e.  Defendant denies any characterization that Uplily was stealing revenues owed to Persnickety LLC. The work, effort, capital, and labor being performed were Uplily's and not Persnickety LLC.

f.  Deny. Uplily was required to pay back any COGs expenses that Persnickety LLC incurred under the license agreement, did all the work of the business, and operated the business according to their own processes including uniquely combining the assets and processes from three entities, separate accounts, and gradually employing new processes and procedures.

g.  Deny. Defendant denies that they transferred assets. The respective SBA banks negotiated the framework for the selling off of assets, seized the assets for sale, and set the price, as well as carrying out the public auction associated with the respective entities. The transaction structure was unique to the bank and each bank dictated the terms of the transaction. In non-material points, there may have been similarities. The intermediaries were unique to the transactions since each SBA bank used their separate intermediaries and legal team to provide feedback and direct the conclusion of the sale. In the basic understanding that SWC handled negotiations and were therefore a part of each of the transactions for the portfolio of the Defendant's companies, is admitted.

h.  Deny. There was no correlation to the timing of Plaintiffs' letter of default and the sale of assets since these transactions were structured over a number of weeks and the public auction was advertised on July 15, 2025 setting the date of the public auction for July 25, 2025 and the final sale was on July 28, 2025, not July 18, 2025.

i.   The Defendant denies that any transaction documents were signed by the Defendant on behalf of both Persnickety LLC and Uplily. Defendant denies controlling the terms, timing, and structure to favor Defendant's interest given Veritex Community Bank decided the terms of the sale of the assets, the purchase price, the date of the public auction, and all other substantive details. The Defendant denies that the purchase date was July 18, 2025.

j.   Deny. Defendant did not sell the assets and since Veritex Community Bank executed their rights to sell the assets under their first secured position, it was their responsibility under the law and the Defendant had no obligation to notify Plaintiffs. The public auction was advertised to the public, including Plaintiffs.

k.   Deny. The Defendant is only a Manager, and the Members of the company exercised major decisions and the ability to hire and terminate the Manager at their discretion. The Member could override any major decision or simply by terminating the Manager. The Defendant denies any willful deception to disclose the Manager role in Uplily since it was immediately disclosed to the Trustee when they asked and the error was corrected in the filing upon it being discovered.

112.   Defendant specifically denies all allegations regarding subjective intent to harm Plaintiffs or defraud creditors. Debtor denies creating defaults using license agreements. The businesses had all shown to be insolvent in 2024 and loan modification agreements had been enacted in Oct 2024. Debtor denies any allegation of transferring assets since Veritex Community Bank conducted the seizure and sale of assets. The Debtor knew nothing of any of these types of negotiations, contracts, or situations and followed all the templated documents and advice of SWC, who has led thousands of SBA debt negotiations. The fact that the Debtor writes about acquiring businesses simply reflects his knowledge of purchasing his past businesses and running them, and no experience he

has other than being led through this transaction by SWC is related to debt work-outs, bankruptcy, or business defaults. Any knowledge he has learned was a direct result of the conversations and advice of SWC. Defendant admits that he would advise other operators to do estate planning prior to signing a personal guarantee which he failed to do.

113.    Defendant specifically denies all allegations regarding claims of knowledge that conduct would substantially certainly cause injury. Defendant acted in a commercially reasonable manner and the Persnickety Prints Business was insolvent due to market factors such as COVID.

114.    Defendant specifically denies he acted maliciously or willfully. Defendant denies that Plaintiffs' deficiency is directly and proximately caused by the Defendant's actions since insolvency occurred in prior years. By Jan 2025 the businesses were simply being shut down in a way that benefitted the primary secured party, Veritex Community Bank who was conducting a sale of the assets of Persnickety LLC. Furthermore, Veritex Community Bank determined what they considered was a fair price based on appraisals of the assets and ultimately sold the assets. The license agreements had no negative effect on the value of the assets as determined by the bank since the same appraisal process would have been used whether or not the license agreements were put into effect. Instead, the license agreements benefited the primary secured party since it prevented the problems with a hard stop of all operations prior to selling off the assets: such as a landlord seizure of assets or assets needing to be liquidated under a short timeline.

115.    Defendant specifically denies he acted maliciously and denies that the debt owed should be excepted from discharge.

116.    Defendant denies Plaintiff's alleged and incorporated facts.

117.    Admit Plaintiff's recitation of the law. Deny any actual fraud, or participating in any scheme to defraud Plaintiff, or any similar characterization.

118.     Defendant denies preserving Persnickety Prints Business for his own benefit. Defendant denies any fraudulent asset transfer. Defendant denies executing any scheme to render the debt uncollectible or participate in any fraud. Veritex Community Bank seized the assets and sold them according to a price they thought was reasonable with input from a third party appraisal.

119.     Defendant denies any "scheme" intended to benefit him at the cost of Plaintiffs. Defendant acted in a commercially reasonable manner relying on consultants and the primary secured party to shut down the insolvent businesses. License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party allowing them time for a full price orderly sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and are not questioning the discharge of the debt in bankruptcy.

120.     Deny that the consultants performed asset-sale transactions since the primary lender Veritex Community Bank negotiated the terms and sold the assets.  Defendant denies any of this was intended to negatively affect Plaintiffs' debt. Defendant denies that Uplily was an undercapitalized acquisition vehicle. Uplily had $1000 from its owner, and received an asset backed loan in the amount to purchase the assets at the bank's estimate of a reasonable value for the assets. Defendant denies nominal ownership by Voyles. Defendant admits to being Manager but denies complete control as to rise to the level of an insider because the Members could terminate the Manager and the Member can decide on Major Decisions. Defendant admits that

SWC templates and advice was used along with discussions with Aren Voyles in drafting the governing documents. Defendant denies that the license agreements were meant to shift revenue generation and operational control to Uplily in advance of any alleged planned foreclosure. The defaults and insolvency occurred in the prior year, 2024 as shown by tax statements, loan modifications, and other documentation and determined independently by the SBA bank and SWC. Defendant admits that the arrangement of the non-exclusive license agreement with Uplily was that Persnickety LLC retained 5% of sales but did not have to deal with overhead costs of manufacturing, marketing, and distributing licensed products in North America. In anticipation of the selling off of Persnickety LLC's assets, all operations in Persnickety LLC were gradually shut down due to insolvency in the previous twelve months. The Defendant is not required to continue to run insolvent businesses, and he shut them down in a way to preserve the assets for the sale and benefit of the primary secured party, SBA bank Veritex Community Bank who sold the assets and determined the selling price of the assets based on their 3rd party appraisal. Defendant denies any characterization that Uplily was stealing revenues owed to Persnickety LLC. The work, effort, capital, and labor being performed were Uplily's and not Persnickety LLC. Defendant denies that they transferred assets. The respective SBA banks negotiated the framework for the selling off of assets themselves and set the price, as well as carrying out a public auction associated with Persnickety LLC. The transaction structure was unique to each bank and each bank dictated the terms of the transaction, whether public auction or Article 9 sale. In non-material points, there may have been similarities. The intermediaries were unique to the transactions since each SBA bank used their separate intermediaries and legal team to provide feedback and direct the conclusion of the sale. In the basic understanding that SWC handled negotiations and were therefore a part of each of the transactions for the portfolio of the Defendant's companies, is admitted. There was no

correlation to the timing of Plaintiffs' letter of default and the sale of assets since these transactions were structured over a number of weeks and the public auction was advertised on July 15, 2025 setting the date of the public auction for July 25, 2025 and the final sale was on July 28, 2025, not July 18, 2025. The Defendant denies that any transaction documents were signed by the Defendant on behalf of both Persnickety LLC and Uplily. Defendant denies controlling the terms, timing, and structure to favor Defendant's interest given Veritex Community Bank decided the terms of the sale of the assets, the purchase price, the date of the public auction, and all other substantive details. Defendant did not sell the assets, and since Veritex Community Bank executed its rights to sell the assets under its first secured position, it was its responsibility under the law, and the Defendant had no obligation to notify Plaintiffs. Defendant does not have final decision-making authority for Uplily. The Defendant denies any willful deception to disclose the Manager role in Uplily since it was immediately disclosed to the Trustee when they asked and the error was corrected in the filing upon it being discovered. Defendant denies any fraud in seeking nonfraudulent debts to be discharged.

121.     Defendant denies any scheme to obstruct Plaintiffs' ability to enforce its security agreement. Plaintiffs are not the primary secured party, and the primary secured party exercised its rights under their agreement to sell off the assets. This was after the businesses became insolvent, not due to fraud, but to market conditions such as COVID. Since the businesses were appraised as insolvent, Veritex Community Bank exercised its rights to collect on the property and sell at public auction. The assets were bought at public auction. Defendant denies any transfer to an insider as Veritex Community Bank made the transfer and Defendant does not control Uplily, LLC. Defendant denies possession or control of Uplily, or assets purchased at the public sale. Defendant denies any concealment, as the primary secured party sent Plaintiffs notice of the public

auction. Defendant denies any transfer but admits that such businesses became insolvent (without any fraud of Defendant) before such sale, and such assets were sold by the primary secured party due to the insolvency of the companies, after appraisals, notice, and public auction. Defendant denies such transfer occurred due to the threatened collection, as the assets were already insolvent and the primary secured party was exercising their rights to collect on the asset when the collection notice was sent. Defendant denies there was grossly inadequate consideration as the primary secured party the asset at public auction after appraising the value of the asset and setting what they deemed to be a fair price. Defendant denies any fraudulent pattern of transfers.

122. Defendant denies any actual fraud or scheme or conduct designed to hinder, delay, or defraud Plaintiffs:

    a. Defendant denies Uplily was an insider entity controlled by defendant. Major decisions were made by Members, and Defendant does not own any interest in Uplily. Defendant denies that Uplily was an undercapitalized acquisition vehicle. Uplily had $1000 from its owner, and received an asset backed loan in the amount to purchase the assets at the bank's estimate of a reasonable value for the assets. Defendant denies nominal ownership by Voyles. Defendant admits to being Manager but denies complete control as to rise to the level of an insider because the Members could terminate the Manager and the Member can decide on Major Decisions. Defendant admits that SWC templates and advice was used along with discussions with Aren Voyles in drafting the governing documents.

    b. Defendant denies there was grossly inadequate consideration as the primary secured party sold the insolvent assets at public auction after appraising the value of the asset.

c. Defendant admits receiving fair market value compensation from Uplily. Defendant denies retaining any control or benefit post-transfer with contractual authority that cannot be overridden. Members may terminate Managers, and during that time, Members make the major decisions.

d. Deny. The assets had been long insolvent, and the negotiation process with Veritex Community Bank confirming that the assets would be sold happened long before any communication from Plaintiffs. However, Defendant does not control Veritex Community Bank's timing and auction process, which delayed while working through Veritex Community Bank's internal processes for multiple months, prior to the time the Plaintiffs sent their notification. In anticipation of the selling off of Persnickety LLC's assets, all operations in Persnickety LLC were gradually shut down due to insolvency in the previous twelve months. The Defendant is not required to continue to run insolvent businesses, and he shut them down in a way to preserve the assets for the sale and benefit of the primary secured party who's process determined the length of the license agreements, SBA bank Veritex Community Bank who sold the assets and determined the selling price of the assets based on their 3rd party appraisal. There was no correlation to the timing of Plaintiffs' letter of default and the sale of assets since these transactions were structured over a number of weeks and the public auction was advertised on July 15, 2025 setting the date of the public auction for July 25, 2025 and the final sale was on July 28, 2025, not July 18, 2025.

e. Defendant denies any characterization that Uplily was stealing or diverting revenues owed to Persnickety LLC. The work, effort, capital, and labor being

performed were Uplily's and not Persnickety LLC. Uplily was required to pay back any cost of goods sold or material expenses that Persnickety LLC incurred under the license agreement, did all the work of the business, and operated the business according to their own processes including uniquely combining the assets from three entities, separate accounts, and gradually employing new processes and procedures.

f.  Deny. There was a public advertisement for the auction and thus it was not secret. Defendant is not contractually or legally required to notify the secondary secured party that the asset is being collected and sold by the primary secured party. That is the duty of the primary secured party. Uplily's 90-day-exclusivity was granted after the public auction, there was no market process eliminated.

g.  Deny, as Defendant testified, the schedules should be amended to include his Manager role in Uplily and HoldingCo. Debtor immediately disclosed his Manager role to the Trustee upon a request of written questions and during the Rule 2004 meeting and did not try to hide or deceive about this fact during any part of the bankruptcy inquiry. Defendant's bankruptcy attorney admitted the bankruptcy software his law firm created confusion around this question leading to an error in filling out the form.

h.  The Defendant denies that any transaction documents were signed by the Defendant on behalf of both Persnickety LLC and Uplily and the signature sections were clearly titled with the correct entities. Defendant denies controlling the terms, timing, and structure to favor Defendant's interest given Veritex Community Bank decided the terms of the sale of the assets, the purchase price, the date of the public

auction, and all other substantive details.

123.    Deny. Defendant specifically denies he intended to hinder, delay, and defraud Plaintiffs. Defendant denies any loss was caused by alleged actual fraud.

124.    Defendant denies that the debt owed should be excepted from discharge.

125.    Defendant denies Plaintiff's alleged and incorporated facts.

126.    Admit recitation of the law. Defendant denies committing any embezzlement.

127.    Deny. Defendant denies that Uplily began operating the Persnickety Prints Business, but admits to using the licensed trademarks, domain names, e-commerce platforms, and associated access credentials when manufacturing, marketing, and distributing licensed products in North America according to the non-exclusive licensing agreements. License agreement was for the benefit of the SBA banks as they allowed time for the process and full price of the assets to be obtained. The SBA bank would have been more likely to receive less if under pressure due to a hard, immediate shutdown of the businesses. License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party allowing them time for a full price orderly sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and are not questioning the discharge of the debt in bankruptcy.

128.    Defendant admits that he operated Persnickety LLC. However, Defendant denies any

characterization that such operations were used to defraud Plaintiffs or embezzle.

129.     Defendant denies any characterization that Uplily was stealing or diverting revenues owed to Persnickety LLC. The work, effort, capital, and labor being performed were Uplily's and not Persnickety LLC. Uplily was required to pay back any expenses that Persnickety LLC incurred under the license agreement, did all the work of the business, and operated the business according to their own processes including uniquely combining the assets from three entities, separate accounts, and gradually employing new processes and procedures. Defendant denies there was grossly inadequate consideration as the primary secured party sold the assets at public auction after appraising the value of the asset. Defendant denies Uplily was an insider entity controlled by Defendant. Major decisions were made by Members, and Defendant does not own any interest in Uplily. Defendant denies that Uplily was an undercapitalized acquisition vehicle. Uplily had $1000 from its owner, and received an asset backed loan in the amount to purchase the assets at the bank's estimate of a reasonable value for the assets. Defendant denies nominal ownership by Voyles. Defendant admits to being Manager but denies complete control sufficient to rise to the level of an insider because the Members could terminate the Manager and the Members can decide Major Decisions. Defendant admits that SWC templates and advice was used along with discussions with Aren Voyles in drafting the governing documents. Defendant denies that employees were "moved" from Persnickety LLC's day-to-day operations to Uplily's payroll. Defendant admits that Persnickety LLC no longer had a separate workforce and no longer had to pay payroll to employees by the end of the first quarter of 2025. Defendant denies that Persnickety LLC had core functions (or had need for such functions) such as sales, order fulfillment, customer service, or marketing because such activities were delegated to a different company while waiting for the SBA bank to complete the process of selling the assets. Defendant denies that the structure chosen by SWC and

Veritex Community Bank was designed to suppress competitive bidding since a public advertisement was made, and no contract was in place to disallow a competitive process. The exclusivity only came after the public auction, appraisal ordered by Veritex Community Bank, and then Uplily being the highest bidder at the auction.

130.     Deny that the consultants performed preplanned default-and-transfer strategy or any asset-sale transactions since the primary lender Veritex Community Bank negotiated the terms and sold the assets. Defendant denies any of this was intended to negatively affect Plaintiffs' debt. Defendant denies that Uplily was undercapitalized acquisition vehicle. Uplily had $1000 from its owner, and received an asset backed loan in the amount to purchase the assets at the bank's estimate of a reasonable value for the assets. Defendant denies nominal ownership by Voyles. Defendant admits to being Manager but denies complete or exclusive control sufficient to rise to the level of an insider because the Members could terminate the Manager and the Members can decide Major Decisions. Defendant admits that SWC templates and advice was used along with discussions with Aren Voyles in drafting the governing documents. Defendant denies that the license agreements were meant to shift revenue generation and operational control to Uplily in advance of any alleged planned foreclosure. The defaults and insolvency occurred in the prior year, 2024 as shown by tax statements, loan modifications, and other documentation and determined independently by the SBA bank and SWC. Defendant admits that the arrangement of the non-exclusive license agreement with Uplily was that Persnickety LLC retained 5% of sales but did not have to deal with overhead costs of manufacturing, marketing, and distributing licensed products in North America. In anticipation of the selling off Persnickety LLC's assets, all operations in Persnickety LLC and the portfolio were gradually shut down due to insolvency in the previous twelve months and earlier utilizing the mechanism of a license agreement. The

Defendant is not required to continue to run insolvent businesses, and he shut them down in a way to preserve the assets for the sale and benefit of the primary secured party, SBA bank Veritex Community Bank who sold the assets and determined the selling price of the assets based on their 3rd party appraisal. Defendant denies any characterization that Uplily was stealing or diverting revenues owed to Persnickety LLC. The work, effort, capital, and labor being performed were Uplily's and not Persnickety LLC. Uplily was required to pay back any expenses that Persnickety LLC incurred under the license agreement, did all the work of the business, and operated the business according to their own processes including uniquely combining the assets from three entities, separate accounts, and gradually employing new processes and procedures. Defendant denies that they transferred assets. The respective SBA banks negotiated the framework for the selling off assets and set the price, as well as carrying out the public auction associated with the respective entities. The transaction structure was unique to the bank, and each bank dictated the terms of the transaction. In non-material points, there may have been similarities. The intermediaries were unique to the transactions since each SBA bank used their separate intermediaries and legal team to provide feedback and direct the conclusion of the sale. In the basic understanding that SWC handled negotiations and were therefore a part of each of the transactions for the portfolio of the Defendant's companies, is admitted. There was no correlation to the timing of Plaintiffs' letter of default and the sale of assets since these transactions were structured over a number of weeks and the public auction was advertised on July 15, 2025 setting the date of the public auction for July 25, 2025 and the final sale was on July 28, 2025, not July 18, 2025. The Defendant denies that any transaction documents were signed by the Defendant on behalf of both Persnickety LLC and Uplily. Defendant denies controlling the terms, timing, and structure to favor Defendant's interest given Veritex Community Bank decided the terms of the sale of the assets,

the purchase price, the date of the public auction, and all other substantive details. Veritex Community Bank, the primary secured party, was responsible for notifying Plaintiffs, the secondary secured party. Veritex Community Bank sent notice to Plaintiff, and it was not Defendant's responsibility. Defendant denies control of Uplily as Defendant's managerial control is subject to termination by Members and Members make major decisions. Defendant denies any characterization that omissions in the schedules were purposeful. Defendant was transparent in the Rule 2004 meeting and forthcoming regarding his Managerial role and immediately corrected the omission once discovered. Defendant does not understand Plaintiff's reference to a June date as to affirm or deny the allegation.

131.    Defendant denies any proceeds were diverted and appropriated. Defendant denies such assets constitute property subject to embezzlement. Defendant denies any embezzlement. Defendant denies that the debt is nondischargeable.

132.    Defendant denies Plaintiff's alleged and incorporated facts.

133.    Defendant admits Plaintiff's recitation of the law.

134.    Defendant denies executing any systematic scheme with intent to hinder, delay, and defraud Plaintiffs and other creditors. Defendant participating in commercially reasonable strategies to wind down an insolvent portfolio while maintaining the maximum amount of value in the company property for the primary secured party, relying on consultants and the primary secured party. Ultimately, the primary secured party, Veritex Community Bank, initiated its rights under its security agreement to collect the property of Persnickety LLC and sell it at public auction. Each primary secured party determined how they chose to dispose of the collateral for their notes and ultimately sold their assets using appraisals for values they determined to be fair in a commercially reasonable fashion.

135.    Defendant denies participating in any scheme involving the Defendant's entire portfolio of businesses. The portfolio had good times, but then bad times occurred and the majority of the portfolio became insolvent, not due to Defendant's actions, but due to market conditions. As the businesses were insolvent, the various primary secured parties chose to collect on the security. Defendant worked under SWC guidance and negotiation with each primary secured party to maximize the value of the insolvent assets. There were two SBA banks who were the primary secured party of the assets, and so the transactions took place in two phases since those banks chose to sell the assets in that manner.

136.    Defendant denies that the licensing structure simply diverted 95% of net sales to Uplily while Persnickety LLC remained obligated to service 100% of its debt to Veritex Community Bank and to Plaintiffs, because due to the agreement, Persnickety LLC did not have to pay additional costs of manufacturing, marketing, servicing, and distributing licensed products in North America. Defendant denies that the licensing structure contributed to any impairment of Persnickety LLC's ability to meet payment obligations under the Veritex Community Bank loan and Plaintiffs' notes. License agreement was for the benefit of the SBA banks, the primary secured party (and correspondingly, the Plaintiffs as secondary secured party), as they allowed time for the process and full price of the assets to be obtained. The SBA bank would have been more likely to receive less if under pressure due to a hard, immediate shutdown of the businesses. License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party (and, as it was to maximize value, to the

secondary secured party) allowing them time for a full price orderly sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and are not questioning the discharge of the debt in bankruptcy.

137. Deny. Pinnacle Financial Partners bank sold off the assets of UNDG F&P LLC and Sunny Lark LLC according to what they thought was a fair price according to their appraisals of the assets. UNDG F&P LLC and Sunny Lark LLC surrendered their assets to Pinnacle Financial Partners. "Subject to the terms and conditions of this Agreement, Company [Sunny Lark LLC and UNDG F&P LLC respectively] will surrender directly to Lender [Pinnacle Financial Partners], simultaneously with Lender selling directly to Purchaser". The primary secured party, Veritex Community Bank, sold off the assets of Persnickety LLC for a price acceptable to them after an appraisal was completed by them. Defendant denies any characterization that the "migration" was a plan to make Persnickety LLC a shell entity by the time of the foreclosure and any "sale" would transfer legal title to a business Uplily had already been operating and monetizing. The sale was carried out in a public auction by the primary secured party, Veritex Community Bank, for their benefit with prices set according to their determination and their appraisal of the assets.

138. Defendant denies employing any scheme. Defendant denies any scheme related to HoldingCo, LLC. Defendant admits forming the entity and denies controlling the entity. Defendant denies any SWC scheme. The real estate asset was appraised by Veritex Community Bank, seized, and sold at the price they determined was fair. Creditors were paid the full value of the assets according to the order of liens and Veritex Community Bank.

139. Defendant admits that the license agreements were executed approximately six months

before the July 2025 transfer of legal title. However, Defendant denies that the agreements pre-positioned Uplily to operate the portfolio businesses and siphon off net sales revenues using the sham license in advance of any foreclosure. When the execution happened, Defendant and SWC believed the sale of the already insolvent assets was imminent and operations were being wrapped up, while maintaining a situation beneficial to the primary secured party allowing them to sell off the assets and get through all their requirements for an Article 9 sale of the assets. The primary secured party's process resulted in the additional months of operations, which SWC and Defendant did not anticipate, ending with a public auction by Veritex Community Bank. This process began after the asset was already insolvent, rather than the process being purposed to make the business insolvent to avoid creditors. The primary secured party, Veritex Community Bank, sold off the assets of Persnickety LLC via public auction for a price acceptable to them after an appraisal was completed by them. Defendant denies any characterization that the "migration" was a plan to make Persnickety LLC a shell entity by the time of the foreclosure and any "sale" would transfer legal title to a business Uplily had already been operating and monetizing. The sale was carried out in a public auction by the primary secured party, Veritex Community Bank, for their benefit with prices set according to their determination and their appraisal of the assets. Exclusivity was granted after Uplily purchased the assets at public auction. Defendant denies eliminating any competitive bidding.

140.    Defendant denies that the Defendant or the Defendant's companies made the alleged transfers to Uplily or HoldingCo LLC. But rather, Pinnacle Financial Partners and Veritex Community Bank, the primary secured party, made such transfers after seizing the assets and obtaining appraisals for all assets. Defendant denies forming or controlling Uplily and HoldingCo. Defendant denies controlling any entity as Manager since Members can terminate the Manager at

any time and make the Major Decisions. Defendant denies authoring the operating agreements. Defendant denies participating in self-dealing. Defendant denies negotiating with himself, setting terms, diverting revenues, and transferring assets, from entities he controlled. Defendant does not control or play any role in Pinnacle Financial Partners and Veritex Community Bank, the primary secured party who sold all assets that were collateralized by their loans. Further, Defendant relied on SWC for any matters he was personally involved in, which negotiated with Pinnacle Financial Partners and Veritex Community Bank on his behalf.

141. Defendant denies any intent to defraud Plaintiffs. a) Defendant denies performing any transfer. b) Defendant denies any transfer involving an insider entity that he formed and controlled. Defendant was subject to termination by the Members, and Members made major decisions of the companies, before and after the public auction. Member, not Manager, performed all major decisions since the inception of Uplily and HoldingCo LLC such as agreeing to and signing the Dune Loan encumbering the assets of Uplily, hiring the Manager, the formation of the companies with SWC, signing the license agreements, signing up for credit cards, approving and signing on any amendments of the operating agreements, and providing and approving of all capital for the business. Today, Managers and Members vote on major decisions. c) Defendant did not intentionally omit his Manager role in his bankruptcy schedule, which was promptly corrected. Defendant willingly and transparently participated in the Rule 2004 meeting and discussed his Manager role, and Defendant provided all documentation showing his Manager role immediately upon request by the trustee. Defendant relied on his bankruptcy attorney to prepare and file his bankruptcy schedules. d) Defendant denies any transfers of all assets and revenues and denies that they were fraudulent. Pinnacle Financial Partners and Veritex Community Bank made such transfers. e) Defendant admits he is currently insolvent; however, Defendant emphasizes that the

Persnickety Prints Business and acquired businesses via the SBA loan became insolvent due to legitimate market conditions, economic factors beyond Defendant's control, and ordinary business risks, rather than any purposeful scheme to defraud creditors. f) Such transfers and defaults were done by SWC and Veritex Community Bank and Defendant had no control over the timing of such transfers. g) Defendant denies there was grossly inadequate consideration as the primary secured party sold the asset at public auction after appraising the value of the asset. h) Defendant denies using license agreements for fraud. Defendant denies any transfer of license agreements were to another insider. Defendant admits that intermediaries were used for the license agreements. The license agreements were for the benefit of the SBA banks as they allowed time for the process and full price of the assets to be obtained. The SBA bank would have been more likely to receive less if under pressure due to a hard, immediate shutdown of the businesses. License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. i) Defendant Denies that the SWC memorialized an "independent decision to default" and deny that the Defendant tasked SWC designing an asset-sale strategy. The Defendant denies advanced planning or has any knowledge about what needed to happen except for what was gleaned from SWC and the SBA banks as the process progressed. Instead, the Defendant engaged with SWC leading to an extended period of independent analysis to determine the insolvency of the businesses and discussion with the SBA banks to determine the options the various businesses had in front of them. The situation was murky, complicated, and the Defendant had very little understanding of what needed to happen upon signing an initial contract having never been in a situation like this before. After proving insolvency, SWC worked with the primary secured party who ultimately determined the sales process, seized the assets and sold the assets using their appraisals to determine what they thought

was a fair value. Deny that the consultants performed asset-sale transactions since the primary lender Veritex Community Bank negotiated the terms and sold the assets. Defendant denies any of this was intended to negatively affect Plaintiffs' debt which had no conceivable way to be paid due to the size of the primary secured party's note and multiple years of insolvency of the portfolio. j) Uplily's 90-day-exclusivity was granted after the public auction, there was no market process eliminated. k) Defendant denies that he controlled the transactions or signed on both sides of the sale. The sections in each document are clearly marked with the correct entities and disprove this assertion. Defendant admits Voyles signed on behalf of Uplily as "Member". Managers had to consent to and approve Member's major decisions; Defendant did not control both sides of the transaction. The Member of Uplily performed and signed all Major Decisions accomplished since the inception of the company. l) Defendant did not sell the assets and since Veritex Community Bank executed their rights to sell the assets under their first secured position, it was their responsibility under the law, and the Defendant had no obligation to notify Plaintiffs. Defendant denies any revenue diversion or transfers to defraud creditors. Deny the use of the same intermediaries since each bank used their structure to sell the collateral assets and their own unique intermediaries. Deny grossly inadequate consideration for the assets since independent appraisals of the assets were made by the primary secured party who then determined a fair market price and sold the assets themselves after seizing them from the Defendant. Deny coordinated asset transfer since each SBA bank seized and sold their own collateral assets, the Defendant transferred no assets. Furthermore, the Defendant had no control over the timing of the sales since the primary secured party sold the assets and determined the structure of the sale.

142.    Deny Defendant denies participating in any carefully orchestrated scheme to preserve the business assets, revenues, and income streams for himself, but rather preserving the assets of

Persnickety LLC in already insolvent businesses for the primary and secondary secured parties to work through their extended process to sell the assets. Defendant denies that the license agreements demonstrate any deliberate and fraudulent nature of a scheme. The license agreements were for the benefit of the SBA banks as they allowed time for the process and full price of the assets to be obtained. The SBA bank would have been more likely to receive less if under pressure due to a hard, immediate shutdown of the businesses. License agreements were short term and simply meant as a stopgap measure while the SBA banks got their ducks in a row for a sale after the businesses had shown years of insolvency. There is no requirement for the Defendant to continue to run insolvent businesses rather than shut them down. After clearly showing the portfolio to be insolvent for over two years the Defendant shut down the businesses in a way that was beneficial to the primary secured party allowing them time for a full price orderly sale of the assets and preventing a seizure by the landlords for unpaid rent or a degradation of the assets if the landlord chose to simply throw away all the assets. This can be shown since the primary secured party participated in the orderly sale of the assets and are not questioning the discharge of the debt in bankruptcy. Pinnacle Financial Partners bank sold off the assets of UNDG F&P LLC and Sunny Lark LLC according to what they thought was a fair price according to their appraisals of the assets. UNDG F&P LLC and Sunny Lark LLC surrendered their assets to Pinnacle Financial Partners. "Subject to the terms and conditions of this Agreement, Company [Sunny Lark LLC and UNDG F&P LLC respectively] will surrender directly to Lender [Pinnacle Financial Partners], simultaneously with Lender selling directly to Purchaser". Defendant denies that his discharge should be denied.

143.    Defendant denies making any false oath or account.

144.    Defendant denies knowingly and fraudulently omitting material information from the

bankruptcy schedule, specifically his role in Uplily, LLC and HoldingCo. Defendant was open and transparent in the Rule 2004 meeting and provided all the documentation immediately upon request by the trustee. The schedules were promptly amended when the error was discovered. Any omission was not intentional. Defendant denies any fraudulent transfer of business assets and revenues with millions of dollars or receiving compensation from such fraud. Defendant denies the businesses were worth millions of dollars since appraisals were received by independent appraisers and the SBA banks each determined the value of the business assets at a much lower valuation.

145. Defendant denies such omissions are material. a) Defendant denies drafting the operating agreements. Defendant denies that the Manager has exclusive authority, as the Members made major decisions, could terminate the Manager, and the Member made and signed for all Major Decisions since the inception of the company. b) Defendant denies diverting business and revenues from entities. Such entities became insolvent and after significant analysis and discussions with the primary secured party, Defendant utilized SWC to effectuate a strategy to best negotiate with the primary secured party and maximize the secured asset value for the creditors, which also would have benefited the secondary secured party. c) Defendant admits to receiving market value salary from Uplily, but Defendant denies any such compensation originates from fraudulent conduct. It is standard industry practice in business acquisitions that when purchasing the assets of a business to hire the previous owner in order to support in a transition and train the new owner how to run the business. Private Equity companies often employ the previous owners to run portfolio companies for extended periods of time. d) Defendant did admit to his management role in Uplily and HoldingCo in the Rule 2004 meeting and immediately provided all documentation to the trustee upon request. d) All documents requested related to the asset sales were provided upon

request and disclosed within the 2004 creditor meeting or the trustee meeting including license agreement, and documents relating to the sale of the assets. Any deficiencies were quickly corrected upon request or discovery of an error. e) Defendant denies the characterization of the disclosures as he did not participate in any fraudulent scheme or conduct. Defendant denies transferring away revenues and assets and retaining control over and benefiting from such assets and revenues. Defendant denies any intentional concealment. Defendant relied on his bankruptcy attorney to draft and file his bankruptcy filing and corrected the bankruptcy schedules promptly once the error was discovered.

146.     Defendant did not knowingly or fraudulently make a false oath. Defendant did testify transparently at his Rule 2004 meeting regarding being Uplily's Manager. Defendant did state that the petition should be amended to disclose his Manager's roles. Defendant denies knowledge of the omissions. Defendant denies that being transparent at the Rule 2004 and amending his petition proves he knew of the omissions when he filed. Defendant relied on his bankruptcy attorney in preparing the petition.

147.     Defendant denies any purposeful false statements in Defendant's Statement of Financial Affairs. Defendant denies that the various business operations continued without interruption under Uplily's control. Pinnacle Financial Partners bank sold off the assets of UNDG F&P LLC and Sunny Lark LLC according to what they thought was a fair price according to their appraisals of the assets. UNDG F&P LLC and Sunny Lark LLC surrendered their assets to Pinnacle Financial Partners. "Subject to the terms and conditions of this Agreement, Company [Sunny Lark LLC and UNDG F&P LLC respectively] will surrender directly to Lender [Pinnacle Financial Partners], simultaneously with Lender selling directly to Purchaser". The primary secured party, Veritex Community Bank, sold off the assets of Persnickety LLC for a price acceptable to them after an

appraisal was completed by them. Defendant denies any characterization that the "migration" was a plan to make Persnickety LLC a shell entity by the time of the foreclosure and any "sale" would transfer legal title to a business Uplily had already been operating and monetizing. The sale was carried out in a public auction by the primary secured party, Veritex Community Bank, for their benefit with prices set according to their determination and their appraisal of the assets. Defendant denies that the agreements pre-positioned Uplily to operate the portfolio businesses and siphon off net sales revenues using the sham license in advance of any foreclosure. When the execution happened, Defendant and SWC believed the sale of the already insolvent assets could be imminent and operations were being wrapped up, while maintaining a situation beneficial to the primary secured party allowing them to sell off the assets and get through all their requirements for a sale resulting in a public auction. The primary secured party's process resulted in the additional months of operations, which SWC and Defendant did not anticipate. This process began after the portfolio was already insolvent, rather than the process making the business insolvent to avoid creditors. The primary secured party, Veritex Community Bank, sold off the assets of Persnickety LLC for a price acceptable to them after an appraisal was completed by them. Defendant denies making any deliberate misstatements designed to obscure any alleged scheme. Defendant denies the license agreements diverted net sales and denies the business operations continued without interruption under Uplily. Uplily licensed trademarks, domain names, e-commerce platforms, and associated intellectual property when manufacturing, marketing, and distributing licensed products in North America according to the non-exclusive licensing agreements. Defendant admits that the arrangement of the non-exclusive license agreement with Uplily was that Persnickety LLC retained 5% of sales but Persnickety LLC did not have to deal with overhead costs of manufacturing, marketing, selling, and distributing licensed products in North America which

were all covered by Uplily.

148.     Defendant denies that any alleged false oath warrants denial of discharge.

149.     Defendant denies that this Court should deny the discharge.

   A.  Defendant denies that Plaintiff should be entitled to such relief.  Defendant denies
       participating in any conduct under 11 U.S.C. § 523(a)(6), 11 U.S.C. § 523(a)(2)(A), and
       11 U.S.C. § 523(a)(4).

   B.  Defendant denies that a judgment should be entered in favor of Plaintiffs for the alleged
       amounts.

   C.  Defendant denies that Plaintiff should be awarded pre-judgment and post-judgment
       interest.

   D.  Defendant denies that the Plaintiff should be awarded reasonable and necessary attorney's
       fees.

   E.  Defendant denies that Plaintiff is entitled to declaratory relief that any amount is owed to
       Plaintiffs.

   F.  Defendant denies that the discharge should be denied under 11 U.S.C. § 727(a)(2)(A) and
       § 727(a)(4)(A).

   G.  Defendant denies that Plaintiffs are entitled to any such other and further relief.

### III. AFFIRMATIVE DEFENSES

1.     <u>Good faith:</u> All transfers, sales, and business decisions were made in good faith and in a
       commercially reasonable manner, consistent with industry standards and the requirements
       of the Uniform Commercial Code (UCC) and bankruptcy law. The primary secured parties
       holding debts owed by Persnickety LLC, Sunny Lark LLC, and UNDG F&P LLC arranged
       the sale of assets, seized the assets, sold the assets, and determined the process by which

the sale would occur including Veritex Community Bank holding a public auction and all SBA banks receiving independent third-party appraisals of assets.

2. <u>Commercial reasonableness:</u> The secured party (Veritex Community Bank) conducted the foreclosure sale in a commercially reasonable manner, as required by UCC Article 9. The sale was public, noticed by publication in a newspaper, and the process followed statutory requirements. Any failure to notify the Plaintiffs did not affect the commercial reasonableness or outcome of the sale, or was not Defendant's responsibility.

3. <u>Right to Deficiency or Surplus (UCC § 9-615):</u> The secured party properly applied the proceeds of the sale, and any deficiency is calculated in accordance with the UCC, and the Plaintiffs' claims for additional amounts is not supported by the statute, appraisals of the assets, or any realistic valuation that would lead to the primary secured party being fully paid off, much less to Plaintiffs' note being paid off.

4. <u>Lack of Willful and Malicious Intent:</u> There was no willful or malicious intent to injure the Plaintiffs, and any injury was incidental or the result of legitimate business decisions, not intentional harm by Defendant. Actions were instead done transparently, working with the primary secured party to follow their process after the SBA banks, the Defendant, and SWC all separately concluded that the portfolio was insolvent.

5. <u>Absence of Actual Fraud/Lack of Intent to Defraud or Hinder Creditors:</u> There was no actual fraud or intent to defraud, and all transactions were conducted transparently, with no intent to hinder, delay, or defraud creditors. Instead, the primary secured party handled the sale of the assets for Sunny Lark LLC, UNDG F&P LLC, and Persnickety LLC and determined the sale price of those assets based on independent appraisals they ordered and their internal process to set a fair valuation of the assets.

6.     No Embezzlement: There was no embezzlement because the property was not appropriated for an unauthorized use, and the use of business assets was within the scope of Defendant's authority and not fraudulent.

7.     Adequate Consideration and Value: The transfers and sales were for reasonably equivalent value or adequate consideration based on third-party appraisals, and ultimately the valuation was set by the primary secured party after seizing and selling the assets.

8.     Compliance with Notice and Process Requirements: All notices (including those for foreclosure or asset sales) required by Defendant were provided in accordance with applicable law (Defendant does not know of any required notices he was supposed to send regarding the foreclosure or asset sales), and any alleged lack of notice to Plaintiffs does not rise to the level of fraud or misconduct or was not Defendant's responsibility.

9.     Reliance on Advice of Counsel or Consultants: Defendant's actions were taken in reliance on the advice of legal counsel or business consultants.

10.    Full Disclosure and Lack of Concealment: Defendant did not intend to conceal assets or make false oaths, and any omissions in bankruptcy schedules were inadvertent or immaterial.

11.    Ordinary course of business: The transactions in question were conducted in the ordinary course of business and not with the intent to hinder, delay, or defraud creditors.

12.    Lack of Standing / No Debt Owed: Plaintiffs' claims are barred because no court has adjudicated that Defendant owes Plaintiffs any debt, and no valid debt exists that may be excepted from discharge. Plaintiffs' security interest was extinguished.

13.  <u>Waiver, Estoppel, or Acquiescence</u>: Plaintiffs received notice of the public auction by Veritex Community Bank and did not bid. Plaintiffs waived their right to bid on the assets and acquiesced Uplily's purchase by not bidding.

14.  <u>Extinguishment:</u> A valid commercially reasonable foreclosure of Veritex Community Bank's senior security interest occurred, and Plaintiffs' junior security interest was extinguished as the sale proceeds cannot satisfy Plaintiff's junior security interest.

15.  <u>Mitigation of Damages</u>: Plaintiffs failed to mitigate any alleged damages.

16.  <u>Attorney's Fees Not Recoverable</u>: Plaintiff's request for attorney's fees is not authorized under 11 U.S.C. § 523, except as permitted by contract or statute, and no such basis exists.

17.  <u>Reservation of Defenses</u>: Defendant reserves the right to assert additional defenses that may become known through discovery.

## IV. DEFENSES

18.  <u>Not an Insider/Owner:</u> Defendant does not own any portion of Uplily, LLC or Holding LLC. Defendant does not control Uplily, LLC or HoldingCo LLC as "Major decisions" require consent of Manager and Members in Uplily, LLC and HoldingCo LLC. Defendant was simply a Manager .

## V. PRAYER FOR RELIEF

WHEREFORE, Defendant Joseph J. Terndrup respectfully requests that the Court:

1.  Deny all relief requested by Plaintiffs;

2.  Dismiss Plaintiffs' Complaint with prejudice;

3.  Grant Defendant his discharge in full;

4.  Award Defendant his costs and such other and further relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted:

**NORRED LAW, PLLC**

By: */s/Solomon G. Norred*
Solomon G. Norred
Texas State Bar No. 24138007
sgn@norredlaw.com
515 E. Border St., Arlington, Texas 76010
O 817-704-3984, F. 817-524-6686
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2026, a true and correct copy of the foregoing was served via the Court's ECF system on all counsel of record and all other parties entitled to service in accordance with the Federal Rules of Bankruptcy Procedure:

Jenny L. Martinez
Texas Bar No. 24013109
jmartinez@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
Taylor J. Grover
Texas Bar No. 24149650
tgrover@munckwilson.com
MUNCK WILSON MANDALA, LLP
1900 Texas Capital Center
2000 McKinney Avenue
Dallas, Texas 75201
972-628-3600
972-628-3616 Fax

*/s/Solomon G. Norred*
Solomon G. Norred