**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **In re:**<br><br>**JOSEPH J. TERNDRUP,**<br><br>    **Debtor.** | |
| **CHARI PACK and CHARI VENTURES, LLC,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**JOSEPH J. TERNDRUP,**<br><br>    **Defendant.** | **Case No. 25-44558-elm7**<br><br>**Chapter 7**<br><br>**Adversary Proceeding No. 26-04004** |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO:    The Honorable E. Lee Morris, United States Bankruptcy Judge.

Plaintiffs Chari Pack and Chari Ventures, LLC ("Plaintiffs"), by and through their

attorneys, hereby submit their proposed Findings of Fact and Conclusions of Law pursuant to the

Court's Scheduling Order as follows:

### I.    INTRODUCTION AND THEORY OF THE CASE

1.    This adversary proceeding arises from a coordinated, pre-planned scheme through

which the Debtor, Joseph J. Terndrup, stripped the profitable Persnickety Prints e-commerce

business of its revenue and assets, funneled them to an insider entity he formed and controls—

Uplily, LLC ("Uplily")—and then filed for Chapter 7 relief in an effort to discharge his personal

guaranty of the debt he owed to Plaintiffs. On June 14, 2023, Plaintiffs sold the Persnickety Prints

business to the Debtor's entity for $2.7 million , financed in part by two seller-carried promissory

notes totaling $572,000.00, secured by the business assets and backed by the Debtor's absolute and unconditional personal guaranty. PACK_000309–369, PX 001; PACK_000370–398, PX 002.

2. Rather than pay Plaintiffs, the Debtor engaged Second Wind Consultants, Inc. to design and implement a coordinated "default-and-transfer" strategy across his business portfolio; formed Uplily as an undercapitalized entity nominally owned by his employee, Aren Voyles ("Voyles"); executed trademark license agreements on January 2, 2025, that diverted 95% of Persnickety's net sales to Uplily while leaving Persnickety obligated for 100% of its debt service; migrated Persnickety's workforce, revenue, and operations to Uplily months before any foreclosure; and then arranged for Uplily to acquire the remaining shell through a pre-negotiated sale for $115,000.00. The Debtor signed the principal transaction documents on both sides. He then filed his Chapter 7 petition while omitting from his sworn schedules his continuing role as Manager of Uplily and HoldingCo, his post-petition arrangements with Uplily, and various other business interests. For the reasons set forth below, the debt the Debtor owes to Plaintiffs is nondischargeable under 11 U.S.C. § 523(a)(6), and in the alternative under § 523(a)(2)(A) and § 523(a)(4), and the Debtor's discharge should be denied in its entirety under 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A).

## II. FINDINGS OF FACT

### A. The Parties and the Persnickety Prints Acquisition

3. Plaintiff Chari Ventures, LLC is a Utah limited liability company formerly known as Persnickety Prints, LLC, and Plaintiff Chari Pack is its owner. PACK_000309, PX 001. [1] Pack founded and built the Persnickety Prints business, an on-demand photo-printing and e-commerce enterprise operating at 190 N. Orem Boulevard in Orem, Utah. PACK_000309, PX 001.

---

[1] Citations to documents are in the following form: [BATES NUMBER], [TRIAL EXHIBIT NUMBER]. Trial Exhibit Numbers correspond to Plaintiffs' Trial Exhibits, filed July 20, 2026.

4.      The Debtor is an investor who posts actively on his website, Drups Investing, about his business successes including having acquired and managed twelve businesses, boasting 143.3% returns, claiming to beat the likes of Warren Buffett and George Soros, and soliciting others to join in his success through his "Fast FI Club" and "Founder's Group." PACK_000043–PX 173–180

5.      The going-concern value of Persnickety Prints lay overwhelmingly in its intangible assets: when Pack sold the business to the Debtor in June 2023, the parties allocated $2,524,060.00 of the $2.7 million purchase price to goodwill and other intangibles on the Form 8594 schedule to the Asset Purchase Agreement. PACK_000337–338, PX 001. The acquisition was financed through (a) a Small Business Administration loan from Veritex Community Bank ("Veritex") in the approximate principal amount of $2,106,300, secured by a first-priority security interest in the assets of the Business; and (b) seller financing from Pack consisting of two promissory notes ("Notes"). PACK_000399–400, PX 003.

6.      The Notes consisted of a $300,000.00 Promissory Note requiring monthly payments of $3,366.22 beginning October 1, 2023, and a $272,000.00 Standby Promissory Note, each secured by a security interest (junior to Veritex) in all business assets ("Security Agreement") and by an absolute and unconditional guaranty executed by the Debtor personally ("Guaranty"). PACK_000376–398, PX 002. The Guaranty obligates the Debtor to pay all amounts due under the notes, together with interest, fees, costs, and attorneys' fees. PACK_000396–398, PX 002.

7.      In addition to financing a substantial portion of the purchase price through the Notes, at closing Chari Ventures paid $125,130 to fund the outstanding customer "print credits" of the business, further capitalizing the enterprise the Debtor acquired. PACK_000399, PX 003.

**B.      Advance Planning of Default with Second Wind Consultants**

8.      About a year later, on July 2, 2024, the Debtor engaged Second Wind Consultants, Inc. ("SWC") under a portfolio-wide Business Consulting Agreement covering six entities the Debtor owned and controlled: UNDG F&P, LLC; Sunny Lark, LLC; Persnickety, LLC; DrupsCo, LLC; Drups Ventures, LLC; and Drups Net LLC. PACK_000589–598, PX 21. [2]

9.      The SWC agreement recited that the client entities "have made the independent decision to default" and described SWC's role as designing and implementing asset sales as "the foundation of the re-organization." PACK_000589–598, PX 21. The SWC Program Schedule expressly targeted the debts to be shed, including the Veritex Loan and Plaintiffs' two seller-financed notes. PACK_000589–598, PX 21. The Debtor granted SWC power of attorney to negotiate with his creditors and paid SWC fees of at least $185,000 under the July 2024 engagement. PACK_000589–598, PX 21.

10.      From the beginning of the SWC program, the Debtor revealed how he "shift[s] money between accounts as needed by the various businesses" and that his books could be "confusing" and that SWC could not "understand how the cash flow works" by looking at the numbers alone. SWC0001630, PX 201; SWC0001658, PX 205. The Debtor noted that "a lot" of expenses shared by the businesses could be charged to Persnickety. SWC0001649, PX 203. The Debtor was particularly focused on making Persnickety look "distressed" in order "to make a good case to the bank." SWC0001654, PX 204; SCW0001683, PX 208. The Debtor suggested falsifying his salary "as a loan [Persnickety] owes me," moving SWC's "legal expenses into [Persnickety]," and omitting payments made to Persnickety connected to the acquisition to achieve such distress. SWC0001654, PX 204; SWC0001683, PX 208.

---

[2] References to "Persnickety" hereinafter refer to the Debtor-controlled entity Persnickety, LLC, a Texas limited liability company.

11.     The Debtor further instructed SWC to not reach out to "Veritex & Persnickety" before he had "transition[ed] everything to a new account" and was "ready to let [Veritex] know [he was] defaulting on the loan." SWC0001649, PX 203. The Debtor expressed concern that SWC's evaluation of Persnickety—which showed Persnickety's cash flow as positive—did not match his own. SWC0001649, PX 203. The Debtor "paus[ed]" his relationship with SWC in October of 2024 to get his financials ready for the default. SWC0001664, PX 206. Despite the Debtor's insistence that Persnickety was underperforming, it grossed $1.8 million in online sales in 2024. PACK_000423–425, PX 008.

12.     The Debtor restarted his relationship with SWC on December 23, 2024, by signing a second SWC engagement with substantially the same terms as the first—including the specific targeting of Plaintiffs' notes. PACK_000589–598, PX 21. The Debtor  signed the agreement as "CEO of Persnickety LLC." PACK_000589–598, PX 21.

13.     The SWC engagements and conversations reflect that, well before the Debtor's bankruptcy filing, the Debtor planned in advance to default on his portfolio obligations, including Plaintiffs' debt, and to implement a coordinated series of asset-sale transactions.

14.     The magnitude of the Debtor's guaranteed obligations supplied his motive to shed debt while preserving the underlying businesses, and he deployed the same method across his portfolio. The SWC Program Schedule targeted the debts to be shed, and the Debtor caused Persnickety, UNDG F&P, and Sunny Lark each to license their intellectual property to Uplily before Uplily acquired those businesses' assets for $115,000.00, $69,000.00, and $31,000.00, respectively—a fraction of their value. PACK_000589–598, PX 21; PACK_000443–458, PX 011–012; PACK_000472–487, PX 016.

## C.     Formation and Control of Uplily and HoldingCo

15.     On August 27, 2024, approximately eight weeks after the initial SWC engagement, Uplily, LLC ("Uplily") was formed as a Texas limited liability company. PACK_000401–404, PX 004. SWC prepared Uplily's formation documents and filed its Certificate of Formation with the Texas Secretary of State. JT00004–6, PX 32. As part of the deal, Uplily became a SWC client under the Debtor's Business Consulting Agreement. JT00004–6, PX 32.

16.     Uplily was nominally owned by Voyles, an employee of the Debtor's Sunny Lark operations, who contributed only $1,000 in capital. PACK_000405–418, PX 005. No additional capital was ever contributed to Uplily. The Debtor was designated as Manager of Uplily with authority to manage and control the entity. PACK_000405–418, PX 005.

17.     The Debtor authored Uplily's Operating Agreement, executed September 28-30, 2024, using templates provided by SWC, and was its first signatory. PACK_000405–418, PX 005. The Operating Agreement vested exclusive management and control of Uplily in the Debtor as Manager, provided that the signature of the Manager alone was sufficient to bind the company, and provided that "Manager, Joseph Terndrup, will unilaterally and at [his] own discretion make the final determination" in the event of any disagreement. PACK_000405–418, PX 005.

18.     The Operating Agreement gave the Debtor unilateral control over Uplily's distributions, bank accounts, and receipts, designated the Debtor as the company's "tax matters partner," and permitted the Debtor to appoint additional managers, admit members, and amend the agreement, none of which the nominal member could override. PACK_000405–418, PX 005. The Debtor testified that he makes all major decisions for Uplily, that there are no other managers or officers, and that he alone decides who is hired, what they are paid, and whether distributions are made. PACK_000129–133, PACK_000137, PACK_000142–146, PACK_000209 (Rule 2004 Examination of Joseph Terndrup).

19.	The Debtor formed HoldingCo, LLC, a Texas limited liability company, ("HoldingCo") on August 21, 2024. PACK_000419–420, PX 006. HoldingCo was set up in virtually the same way as Uplily with nearly identical operating agreements: Voyles as the ostensible owner, with the Debtor maintaining complete control of the entity and deriving benefit therefrom. JT004575–4588, PX 098. SWC again filed formation documents with the Secretary of State, and HoldingCo was added to the Debtor's Business Consulting Agreement with SWC. PACK_000419–420, PX 006, JT000001–4, PX 031.

20.	On March 12, 2025, the Debtor formed Uplily OÜ, an Estonian entity. Uplily OÜ was capitalized with €1.00 and is wholly owned by Uplily. PACK_000725–737, PX 181–184. The Debtor is listed as a beneficial owner on the filing with "[d]irect ownership." PACK_000725–737, PX 181–184. Voyles is listed as a "[m]anagement board member." PACK_000725–737, PX 181–184.

21.	On March 23, 2025, the Debtor, through Voyles, directed Uplily and HoldingCo to each execute a Membership Interest Option to Purchase Agreement ("Option Agreement") with DexCo, LLC ("DexCo")—an entity owned and operated by the Debtor's father, Craig Terndrup. The Option Agreements allow DexCo to purchase "100% of the Shares" of Uplily and HoldingCo for $1,000.00, respectively. JT001981-1988 PX 192–93. The Option Agreements also provide that DexCo may assign the option "to a person or company" at DexCo's "sole discretion." JT001982,1986, PX 192–93.

**D.	Pre-Foreclosure Revenue Diversion and Operational Migration**

22.	On January 2, 2025, pursuant to the SWC plan and within minutes of one another, the Debtor caused Persnickety, UNDG F&P, and Sunny Lark, each to execute a trademark license agreement in favor of Uplily (collectively, the "License Agreements"). PACK_000626–655, PX 024–026. The Debtor created each License Agreement and signed on behalf of the licensor entities,

including signing as "Persnickety LLC Owner," while Voyles signed on behalf of Uplily. PACK_000626–655, PX 024–026. Voyles executed all three license agreements within minutes of receipt. PACK_000626–655, PX 024–026.

23.     Each License Agreement granted Uplily a five-year license to use the licensor's trademarks in exchange for a 5% royalty on sales. PACK_000626–655, PX 024–026. Following execution, Uplily began operating the Persnickety Prints Business using the licensed trademarks, domain names, e-commerce platforms, and access credentials. Revenues from Persnickety-branded sales were deposited directly into bank accounts controlled by Uplily rather than Persnickety. JT000275, PX 058; JT000613–617, PX 064; VOYLES000269–270, PX 188

24.     Under this structure, Uplily retained 95% of net sales while Persnickety remained obligated for 100% of its debt service to Veritex and to Plaintiffs. The Debtor acknowledged that the licensing scheme enacted his "plan to consolidate the entities." JT004616, PX 102. In email correspondence on January 2, 2025, the Debtor observed that he would be "entering default this month" and needed to "move fast on whatever loan applications are required" to finance the planned transfer. JT004616, PX 102.

25.     On January 13, 2025, Veritex contacted the Debtor. The Debtor immediately consulted with SWC on whether he should respond or "go dark" until "all the loans [are] in place." JT004724, PX 105. On January 28, 2025, the Debtor asked Veritex for "an additional 90-day interest only forbearance." JT004843, PX 109. Meanwhile, SWC introduced the Debtor to brokerage firm Brock and Grey in order to list the Debtor's businesses for sale to prepare for the impending default. SWC0001646–1648, PX 202. Despite Persnickety being listed throughout February and March of 2025, the Debtor never informed Pack about the listing. SWC0001673–1675, PX 207.

26.     On March 3, 2025, SWC introduced the Debtor to Dune Funding ("Dune"), a lender to provide Uplily with the cash to purchase Persnickety. JT005059, PX 115. The Debtor did all of the negotiating of the Dune loan with no input from Voyles. JT000608–668, PX 064; JT000671–672, PX 065; JT000701–706, PX 066; JT000715–719, PX 067; JT000750–803, PX 069. The Debtor promised Dune that Uplily "will be asset rich, have a lot of cash, and have no loans except yours." JT005449, PX 117. The Debtor and Voyles executed the financing documents on behalf of Uplily with Voyles signing a personal guaranty. JT000051–56, PX 040; JT000059–76, PX 042; JT010724–10728, PX 043. Dune loaned Uplily $225,000 for the Persnickety acquisition, secured by a security interest in all of Uplily's assets. JT000059, PX 042.

27.     While the Debtor organized the financing, the employees supporting Persnickety's day-to-day operations were moved to Uplily's payroll, such that by the end of the first quarter of 2025, Persnickety no longer maintained a workforce for core functions such as sales, order fulfillment, customer service, and marketing. JT004384–4439, PX 097; VOYLES00269–270, PX 188. The Debtor drained the remaining cash from Persnickety and, effective June 1, 2025, began receiving compensation directly from Uplily. JT000750–803, PX 069; JT004384–4439, PX 097.

28.     The Uplily payroll records confirm that the business was not failing. Total Uplily payroll from August 2024 through December 2025 was $842,834.86, and Wes Lipscomb continued to receive biweekly payments from Uplily throughout 2025—contradicting the Debtor's testimony that Lipscomb had departed at the beginning of 2025 because "Persnickety was doing poorly" and had "falling sales and profitability." JT004384, PX 097; PACK_000179 (Rule 2004 Examination of Joseph Terndrup).

29.     On March 13, 2025, the Debtor had an appraisal done on Persnickety's assets. JT000040–49, PX 53. This appraisal concluded that the liquidation for the physical assets of the

business was $123,041.00. JT000040–49, PX 53. Veritex performed an appraisal on April 29, 2025, which similarly only evaluated the physical assets. DX 101. The appraisal concluded that the fair market value for the assets was $160,000.00 and the liquidation value ranged from $85,000.00 to $120,000.00. DX 101. Neither appraisal accounted for the value of Persnickety's intangible assets.

30. On June 2, 2025, the Debtor, acting on behalf of Persnickety, executed trademark assignments transferring the "PERSNICKETY PRINTS" registrations (Reg. No. 4450201; Ser. No. 98397788) to Uplily for one dollar in nominal consideration. USPTO Trademark Assignment, Reel 009005, Frame 0289–91, PX 209. The trademark assignments were filed with the United States Patent and Trademark Office on September 18, 2025. USPTO Trademark Assignment, Reel 009005, Frame 0289–91, PX 209.

31. The January-to-July 2025 revenue diversion and operational migration stripped Persnickety of its revenue-generating capacity and left it a shell, ensuring that Persnickety could not satisfy Plaintiffs' notes and that any later sale would transfer legal title to a business Uplily had already been operating and monetizing for months.

**E.      The Pattern of Insider Transfers**

32. On June 2, 2025, UNDG F&P and Sunny Lark transferred substantially all of their assets to Uplily through private sales for approximately $69,000.00 and $31,000.00, respectively. PACK_000443–458, PX 011–012. The Debtor executed the transaction documents on behalf of the selling entities, and Voyles executed them on behalf of Uplily. PACK_000443–458, PX 011–012. These sales resulted in the discharge of all liens and allowed Uplily to operate the companies with the same employees, processes, and assets as before. PACK_000443–458, PX 011–012.

33. In addition to the asset sales, the Debtor sought to sell a single-family residence ("SFR") owned by DrupsCo to HoldingCo. JT007086–7093, PX 133. Veritex held a junior lien on

the SFR. JT006580, PX 123. On April 21, 2025, the Debtor discussed how best to "legitimize" a fast closing and "lower buyer bid" on the real property sale by strongarming Veritex into accepting "a lower cost sale" because the first lien holder's line of credit was soon due. JT006580, PX 123. During negotiations of the sale, the Debtor emphasized that everything should be done through HoldingCo and "[his] personal name shouldn't be on anything." JT001084, PX 072.

**F.      Default, Notice, and the Sham Sale of the Persnickety Prints Business**

34.     By early 2025, Persnickety defaulted on the Veritex Loan, and by May 2025 it stopped making payments on the $300,000.00 Note held by Plaintiffs. PACK_000006–7, PX 168

35.     On April 24, 2025, SWC sent a Letter of Intent ("LOI") to purchase Persnickety's assets for what the Debtor considered "a good offer." JT006594, PX 125. Veritex rejected the initial LOI but ultimately approved sale of Persnickety's assets to Uplily for $115,000.00 on June 6, 2025—six weeks before the public auction. JT007086–7093, PX 133; JT000575–577, PX 039. The Debtor and SWC negotiated the price on behalf of Uplily. JT007129–7179, PX 134–35.

36.     Throughout the negotiations, Veritex had several questions about SWC's involvement and the structure of the sale including whether SWC was taking a fee out of the deal and whether the sale would be private or public. JT000743–747, PX 068; JT007306–7312, PX 137; JT001260–1261, PX 081. Scrutiny reached a point where "nobody [at Veritex] like[d] the request." JT001064–1066, PX 071.

37.     Because of the confusion about the sale, Veritex sent another commitment letter on July 1, 2025, with substantially the same terms as the June 6th approval. JT0001060–1063, PX 070. The Debtor sent an updated LOI on July 11, 2025, which contained the same terms as the commitment letter with an additional six-month exclusivity provision. JT007968–7972, PX 191.

38.     On June 20, 2025, the Debtor corresponded with Pack in a series of emails regarding the status of the default. PACK_000459–466, PX 013. The Debtor consulted with SWC

on how to respond. JT007768–7769, PX 141; JT007815–7816, PX 146. While SWC recommended notifying Pack about the sale, the Debtor chose not to. JT007823, PX 149. On June 28, 2025, the Debtor sent a communication to Pack to "buy another week or two" for the sale to occur. JT007826–7828, PX 150, JT007856–7859, PX 152. On July 2, 2025, the Debtor told Pack he would be out of office until July 14. JT007855, PX 152.

39.     On July 9, 2025, the Debtor expressed to SWC the need to "move forward with everything that's ready to go" for the sale of the Persnickety assets in order to "help with the Chari issue." JT001134–1135, PX 073. Accordingly, on July 12, when Veritex asked whether the buyer needed time to conduct due diligence or complete closing, the Debtor responded that "the buyer . . . prefers to close as quickly as possible." JT001179–1181, PX 077.

40.     On July 15, 2025, Veritex mailed Pack a Notice of Disposition of Assets which stated Persnickety's assets would be sold at auction on July 25, 2025, in Dallas Texas. PACK000467–469, PX 14. Although the notice of sale emphasized only tangible equipment, the sale conveyed the full going-concern asset package, including all intellectual property, domain names, customer lists, e-commerce credentials, and goodwill. PACK000467–469, PX 14. Pack did not receive this Notice until after the sale occurred.

41.     That same day, SWC sent a template Bill of Sale for Veritex to review which contained the essential terms of the transaction: Persnickety selling all business assets to Uplily for $115,000.00. JT001334–1339, PX 085. Veritex approved the sale terms with a commitment letter. JT007986, PX 190.

42.     On July 17, 2025, Pack sent a written Notice of Default to Persnickety and to the Debtor personally, demanding cure. The Debtor responded that he would "touch base with the SBA bank" and would get back in "a few weeks at least." JT008051, PX 155.

43. On July 18, 2025, one day after receiving Plaintiffs' Notice of Default, the Debtor executed a Secured Party Sales Agreement providing for the sale of substantially all the Persnickety Prints Business assets to Uplily for $115,000.00, less an 8% broker's commission. PACK_000472–487, PX016. The assets included "general intangibles" even though such assets were not part of any appraisal conducted beforehand. PACK_000478, PX016.[3] The agreement granted Uplily a 90-day exclusive right to acquire the assets. PACK_000472–487, PX016.

44. The Debtor signed the transaction documents on both sides of the sale, executing on behalf of Persnickety as "Owner & Manager" and, through his managerial control of Uplily, directing Voyles to sign on behalf of Uplily as "Member." PACK_000472–487, PX016; JT001327, PX 083.

45. On July 25, 2025, Veritex conducted an "uneventful" sale wherein Uplily, through SWC, was the highest bidder at the previously agreed-upon price of $115,000.00. SWC0001353, PX 198. A Bill of Sale and a Voluntary Surrender Agreement were executed on July 28, 2025, and Veritex received net proceeds of $105,800. PACK_000470–471, PX 015.

46. In the period leading up to and through the transfer, the Persnickety Prints business performed roughly the same as it did in 2024: generating low-to-mid six figure monthly online sales, grossing over $1.6 million in 2025. PACK_000428–430, PX 009.

47. The Debtor notified Pack that the assets had been sold on August 15, 2025. JT008770, PX 157. On October 24, 2025, Plaintiffs brought a lawsuit in the United States District

---

[3] The "general intangibles" included "trademarks, service marks, trade names, patents, intellectual property, vendor names, copyrights, licenses, and franchises, customer lists, patents, and all rights under any license agreements for use of the same, as well as all domain names, domain rights, information to access and maintain information stored within third party managed servers, social media accounts, social media advertising accounts, electronic files and websites hosting the same." PACK_000478, PX 016.

Court for the District of Utah against Persnickety, the Debtor, Uplily, and Veritex for, among other things, breach of the Debtor's payment obligations under the promissory notes and Guaranty, and conspiracy to defraud creditors through the July 2025 asset transfer. PACK_000673–685, PX 030.

**G.    The Bankruptcy Filing and Omissions**

48.    On November 21, 2025, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code (the "Petition"), seeking to discharge the Guaranty and more than $5.2 million in personally guaranteed obligations. PACK_000488–567, PX 17.

49.    In December 2025, the Debtor and Uplily executed a Business Loan Agreement wherein the Debtor purportedly loaned Uplily $600,000.00 due on or before December 31, 2026. VOYLES00146, PX 185; JT009006–9019, PX 164 (email transmitting unsigned loan and consulting agreements). The Business Loan Agreement also provided the Debtor with a security interest in all of Uplily's inventory, equipment, and business assets—the very assets he had sold to Uplily five months prior. VOYLES00146, PX 185. The Business Loan Agreement further allowed Uplily to convert any amount of the indebtedness into membership units and add the Debtor as a member. VOYLES00146, PX 185. Voyles confirmed that Uplily never received $600,000.00 from the Debtor. Deposition of Aren Voyles at 53:12–16 (May 29, 2026). The Debtor omitted this more than half million-dollar receivable, security interest, and membership conversion option from his amended bankruptcy schedules and SOFA. DX 108–09.

50.    In his Statement of Financial Affairs ("SOFA"), filed January 29, 2026, the Debtor stated that Persnickety's "operations ceased" and that its assets were "sold off" on June 27, 2025, although the Secured Party Sales Agreement was not executed until July 18, 2025, the public sale did not occur until July 25, 2025, and the Bill of Sale and Voluntary Surrender Agreement were not executed until July 28, 2025. DX 108.

51.     The Debtor's bankruptcy schedules obscured his role as Manager of Uplily. Schedule I lists Debtor as a future "Operations Manager" for Uplily beginning on November 24, 2025, even though he has been a manager of Uplily since its inception in 2024 and had taken a salary. PACK_000530, PX 17. Despite this being brought to his attention during his Rule 2004 examination in January 2026, the Debtor did not rectify this error on his amended schedules filed on April 17, 2026. DX 108.

52.     The Debtor further omitted his ongoing managerial role at HoldingCo, for which he had an employment agreement for $140,000.00 a year, and his ownership interest in Uplily OÜ from his schedules entirely. PACK_000488–566, PX 17; JT004553–4560, PX 098; DX 108–09.

53.     The Debtor also failed to schedule other interests, including Drups Legacy LLC, a Texas limited liability company formed January 21, 2025, of which the Debtor is Manager; Drups Ecosystem LP, a Delaware limited partnership of which the Debtor is the 100% partner; and a Uplily international (Wise) bank account reflecting international transfers throughout 2025. None appear on the Debtor's original or amended schedules. JT009976; JT009984–9988; JT010822.

54.     On December 5, 2025, the Debtor represented that he was "unemployed" and could not provide pay stubs for the sixty days preceding the Petition Date. Debtor's Employee Income Statement filed December 5, 2025. However, The Debtor had signed an at-will W-2 employment offer from Uplily on November 14, 2025—seven days before filing—and, on December 19, 2025, twenty-eight days after filing, executed a $600,000.00 Consulting Agreement and the $600,000.00 Business Loan Agreement with Uplily, instructing Voyles the following day to "cancel W2 employment and setup a contractor agreement." PACK_000116–118 (Rule 2004 Examination of Joseph Terndrup); JT009006, PX 164.

### III. CONCLUSIONS OF LAW

55. Plaintiffs claim that the Debtor's obligations to Plaintiffs are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(6), (a)(2)(A), and (a)(4). Alternatively, Plaintiffs argue that none of the Debtor's obligations are subject to discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(4)(A). For the following reasons, the Court agrees:

56. Pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984), the Court has jurisdiction of this adversary proceeding.

57. Venue is proper in the Fort Worth Division of the United States Bankruptcy Court for the Northern District of Texas pursuant to 28 U.S.C. § 1409.

58. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I) and (J).

### A. Plaintiffs' Claims

#### i. Nondischargeability Under Section 523(a)(6) of the Bankruptcy Code

59. A debt is nondischargeable if it arises from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

60. In the Fifth Circuit, a creditor may satisfy § 523(a)(6)'s "willful and malicious injury" standard by establishing "either (a) a subjective motive to cause harm on the part of the debtor, or (b) an objective substantial certainty of harm from the debtor's actions." *Leon v. Bianco (In re Bianco)*, Adv. No. 20-04003, 2022 WL 3954547, at *12 (Bankr. N.D. Tex. Aug. 30, 2022) (citing *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998)); *see Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998) (holding that a doctor's negligent prescription of medication was not "willful and malicious" under section 523(a)(6))

61. "Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be nondischargeable do so by determining whether the debtor's

actions were at least substantially certain to result in injury." *Berry v. Vollbracht (In re Vollbracht),* 276 F. App'x 360, 361–362 (5th Cir. 2007) (per curiam) (cleaned up).

62.     "Injuries covered by section 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6)." *Int'l Beauty Prods., LLC v. Beveridge (In re Beveridge)*, 416 B.R. 552, 571 (Bankr. N.D. Tex. 2009).

63.     A debtor acts intentionally and maliciously pursuant to section 523(a)(6) when he makes intentional misrepresentations to obtain "extensions of credit" to "the debtor and entities with whom [the debtor] [is] affiliated." *See Assoc. Grocers of Colo., Inc. v. Horton (In re Horton)*, 152 B.R. 912, 914, 916 (Bankr. S.D. Tex. 1993) (holding that obtaining, among other things, "extensions of credit" through the intentional provision of "false financial reports" constituted a willful and malicious injury under section 523(a)(6)).

64.     A willful and malicious injury can also occur where a debtor obtained financing, that the debtor did not intend to pay back, through a fraudulent scheme that relied on insider-controlled entities. *See Leon v. Bianco (In re Bianco)*, Adv. No. 20-04003, 2022 WL 3954547, at *3–4, *12 (Bankr. N.D. Tex. Aug. 30, 2022).

65.     The Debtor's conduct satisfies the willful and malicious injury standard under section 523(a)(6). Applying the objective substantial certainty test, the evidence demonstrates that the Debtor deliberately engaged in a coordinated scheme to deprive Plaintiffs of their ability to collect on the Notes.

66.     The Debtor's formation of Uplily as an insider entity to receive the operating assets of his portfolio companies mirrors the arrangement in *Leon*, where the debtors organized an LLC with a straw owner to conceal their involvement while retaining actual control, and used the entity to receive investor funds they never intended to apply to the represented purpose. 2022 WL

3954547, at \*3–4. Likewise, the totality of the evidence establishes that the Debtor acted with the subjective intent to injure Plaintiffs, or at minimum that injury to Plaintiffs was an objectively substantial certainty of the Debtor's actions. The Debtor engaged SWC nearly a year in advance to plan a default specifically targeting Plaintiffs' Notes; formed Uplily as an insider entity to receive operating assets; diverted 95% of Persnickety's revenue to Uplily through the License Agreements while Persnickety remained obligated for 100% of its debt; orchestrated the sale of Persnickety's assets at a fraction of their value to the entity he controlled; and sought to discharge his personal obligations while concealing his continuing control over Uplily from his bankruptcy schedules. Taken together, the Debtor's actions constitute willful and malicious injury under section 523(a)(6). Accordingly, the debt owed by the Debtor to Plaintiffs arising from the Notes and the Guaranty is nondischargeable.

### ii. Nondischargeability Under Section 523(a)(2)(A) of the Bankruptcy Code

67. "A discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for money . . . or an extension . . . of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A).

68. "A creditor must prove its" § 523(a)(2)(A) claim "by a preponderance of the evidence." *Saenz v. Gomez* (*In re Saenz*), 899 F.3d 384, 394 (5th Cir. 2018).

69. A creditor may "demonstrate the applicability of § 523(a)(2)(A) by establishing that the debt was obtained either by false pretenses or, alternatively, actual fraud." *Choi v. Tan (In re Tan)*, 670 B.R. 464, 475 (E.D. Tex. 2025) (citing *Husky Int'l Elecs. Inc. v. Ritz*, 578 U.S. 355, 366 (2016)).

70. "The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l*

*Elecs. Inc.*, 578 U.S. at 359. "Fraudulent conveyances typically involve 'a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration.'" *Id.* at 361 (citation omitted). Plaintiffs must show "(1) money was obtained; (2) obtaining the money was done through the Debtor's actual fraud; and (3) as a result of these circumstances, a personal debt of the Debtor was created." *Husky Int'l Elecs. Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 762 (Bankr. S.D. Tex. 2017).

71.     "Though cases often say that exclusions from dischargeability should be narrowly construed . . . preventing fraud is more important than letting defrauders start over with a clean slate." *McClellan v. Cantrell*, 217 F.3d 890, 893–94 (7th Cir. 2000) (a two-step maneuver of transferring assets beyond a creditor's reach and then invoking bankruptcy to defeat the rights of the creditor is actual fraud and a "blatant [] abuse of the Bankruptcy Code").

72.     However, § 523(a)(2)(A) only excepts from discharge debts "actually obtained by, or at least 'traceable to,' the fraudulent conveyance." *NextGear Capital, Inc. v. Lorca (In re Lorca)*, Adv. No. 20-04057, 2025 WL 2964164, at *10 (Bankr. N.D. Tex. Oct. 20, 2025) (citing *Husky Int'l Elecs. Inc*, 578 U.S. at 365); *see Prado v. Erickson (In re Erickson)*, 584 B.R. 816, 819 (Bankr. W.D. Tex. 2017) (denying section 523(a)(2)(A) exception to discharge because "there [was] no allegation . . . that there [was] any connection between" the allegedly fraudulent transfers "and the pre-existing debt.").

73.     The Plaintiffs have shown by a preponderance of the evidence that the Debtor's conduct constitutes "actual fraud" within the meaning of section 523(a)(2)(A).

74.     *First*, money was obtained when "the Debtor transferred [Persnickety revenue] out of [Persnickety]'s account into the accounts of the Debtor-Controlled Entit[y]," Uplily. *Ritz*, 567 B.R. at 762. Not only did the Debtor control Uplily, but Debtor later executed a loan agreement

with Uplily wherein he loaned $600,000.00 in exchange for a security interest in all of Uplily's assets, "put[ting] [Uplily] into a much better position to pay off the large debt" owed to the Debtor. *Id.*

75.     *Second*, the Debtor exhibited several badges of fraud in obtaining the money and assets of Persnickety including transferring Persnickety revenues and assets to Uplily, an insider entity controlled completely by the Debtor; concealing the transfer from the Plaintiffs; the transfer occurred after Plaintiffs sent the Debtor a Notice of Default; transferring the assets for a fraction of the value of the business; becoming insolvent shortly after the transfer was made; obtaining a security interest in the assets five months after the sale during the pendency of his bankruptcy; and concealing his role at Uplily on his Bankruptcy schedules. *Id.* at 740, 752–53, 762.

76.     *Third*, the debt owed to Plaintiffs is "traceable to" the Debtor's fraudulent conveyances. Unlike the situation in *In re Erickson*, where the court denied § 523(a)(2)(A) relief because "there [was] no allegation ... that there [was] any connection between" the allegedly fraudulent transfers "and the pre-existing debt," 584 B.R. at 819–20, here the connection is direct: the License Agreements and insider transfer directly prevented Persnickety from generating the revenue necessary to satisfy its obligations under the Notes, leaving Plaintiffs with a deficiency caused by the Debtor's fraud. Importantly, "[t]he fact that the creation of the [] Debt itself—i.e., the obligation owed by [the Debtor] to [Plaintiffs]—was not due to any fraud (but rather due to the fact that [Persnickety] failed to pay the obligations that it owed to [Plaintiffs] under the [Promissory Notes]) does not change this conclusion." *Ritz*, 567 B.R. at 762.

77.     The Debtor's conduct is analogous to the scheme in *Husky*, where the debtor "drained [the entity] of assets available to pay the debt by transferring large sums of money to

other entities [he] controlled." 578 U.S. at 357. Accordingly, the debt owed by the Debtor to Plaintiffs arising from the Guaranty is nondischargeable under § 523(a)(2)(A).

**iii. Nondischargeability Under Section 523(a)(4) of the Bankruptcy Code**

78. Pursuant to section 523(a)(4) of the Bankruptcy Code, "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for . . . embezzlement[.]" 11 U.S.C. § 523(a)(4).

79. To except a debt from discharge on an embezzlement theory, a creditor must establish: "(1) appropriation of funds by the debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent." *Lorca*, 2025 WL 2964164, at *13 (citing *Johnson v. Steen* (*In re Steen*), 626 B.R. 469, 477 (Bankr. N.D. Tex. 2021)).

80. The appropriation element "must be of property belonging to someone other than the debtor." *Johnson v. Steen* (*In re Steen*), 626 B.R. 469, 477 (Bankr. N.D. Tex. 2021); *see Am. Nat'l Ins. Co. v. Bossier (In re Bossier),* Adv. No. 11-06002, 2012 WL 2891215, at *6 (Bankr. W.D. Tex. July 16, 2012) (observing that embezzlement "involve[s] debts arising from the debtor's acquisition or use of property that is not the debtor's").

81. The second element is satisfied where the debtor is the ultimate recipient of the appropriated funds. *See Lorca*, 2025 WL 2964164, at *14.

82. "Fraudulent intent may be proved by circumstantial evidence." *Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 200 (Bankr. S.D. Tex. Feb. 2, 2006). Factors relevant to a determination of the third element, fraudulent intent, include: "(1) whether the debtor alone had access to the creditor's money; (2) whether the debtor had knowledge that the creditor wanted his money returned; (3) whether the debtor had accounted to the creditor for the funds; and (4) whether an accounting had been made for the funds." *Id.* at 201 (citing *Pool v. Johnson*, No. 3:01-CV-1168-L, 2002 WL 598447, at *3 n.2 (N.D. Tex. Apr. 15, 2002)).

83. The Debtor's conduct satisfies the elements of embezzlement under section 523(a)(4).

84. *First*, the Debtor appropriated property belonging to Plaintiffs. The Security Agreement granted Plaintiffs a security interest not only in the assets sold but also in all "rents revenues, issues, profits, and proceeds arising from the sale, lease, license, encumbrance, collection or any other temporary or permanent disposition" of those assets. This interest in proceeds attached to revenues generated by the collateral the moment they were received. *See* Tex. Bus. & Com. Code § 9.315(a)(2) (security interest continues in identifiable proceeds). Moreover, once the Debtor caused Persnickety to execute the License Agreements and transferred substantially all operating assets to Uplily, the "Due on Sale" provision in the Notes accelerated the entire balance, making it "immediately due and payable." From that point forward, Persnickety's revenues were required to satisfy Plaintiffs' accelerated claim—not to fund operations of the Debtor's newly-formed insider entity. *See Lorca*, 2025 WL 2964164, at *14 (finding embezzlement where debtor personally withdrew funds subject to contractual obligations and failed to transfer them to secured creditor). By diverting 95% of sales revenue to Uplily while Persnickety remained obligated for 100% of its debt service, the Debtor appropriated funds in which Plaintiffs held a perfected property interest and which were contractually required to be used to satisfy Plaintiffs' now-accelerated secured claim.

85. *Second*, the Debtor appropriated the funds for his own use or benefit. The Debtor controlled Uplily as its Manager and received compensation from Uplily tied to the diverted revenue. The Debtor testified that he makes all major decisions for Uplily and that he alone decides who is hired, what they are paid, and whether distributions are made. The Operating Agreement vested exclusive management and control of Uplily in the Debtor as Manager, providing that

"Manager, Joseph Terndrup, will unilaterally and at [his] own discretion make the final determination" in the event of any disagreement. Although the diverted funds flowed to Uplily rather than directly to the Debtor's personal account, the Debtor's complete control over Uplily and his receipt of compensation from Uplily establish that the diverted funds were appropriated for his use or benefit. Moreover, the Debtor executed a consulting agreement wherein Uplily was obligated to pay his $600,000.00 salary which was secured by a security interest in all of Uplily's assets, including the appropriated funds.

86.     *Third*, the Debtor acted with fraudulent intent. The Debtor alone had access to Persnickety's revenue streams through his position as Owner and Manager of Persnickety and his subsequent control of Uplily. The Debtor had knowledge that Plaintiffs wanted their money returned: Plaintiffs had been communicating about resuming payments, sent a Notice of Default, and the SWC engagement documents expressly identified Plaintiffs' Notes as debts to be shed through the planned default strategy. The Debtor did not account to Plaintiffs for the diverted funds; instead, he concealed the licensing agreements, the transfer of assets, and his role as Manager of Uplily on his bankruptcy schedules and falsely stated that his businesses had "ceased" operations when they continued to operate through Uplily. As the court observed in *Davenport*, a debtor who is "aware that the creditors wanted their funds to be returned" and who "expended such funds without accounting for them" demonstrates the fraudulent intent required for embezzlement. 353 B.R. at 200–01. The Debtor's scheme was designed to deprive Plaintiffs of their ability to collect on the Notes while preserving the value of the Business for the Debtor's benefit through Uplily. Accordingly, Plaintiffs' claim against the Debtor is nondischargeable under section 523(a)(4).

#### iv. Objection to Discharge Under Section 727(a)(2)(A) of the Bankruptcy Code

87. A debtor will be denied a discharge if "the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A)

88. A creditor must establish the following elements to prevail under § 727(a)(2)(A): "'(1) a transfer [or concealment] of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; [and] (4) with intent to hinder, delay, or defraud a creditor or officer of the estate.'" *Coleman Cnty. State Bank v. Boyd (In re Boyd)*, Adv. No. 17-04089, 2024 WL 557927, at *19 (Bankr. N.D. Tex. Feb. 12, 2024) (quoting *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005)).

89. A "transfer" includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).

90. "Recognizing that actual intent is difficult to prove because the debtor will rarely admit to fraudulent intentions, the courts have outlined several so-called badges of fraud which may evidence an actual intent to defraud. The Fifth Circuit has listed the following general badges of fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry."

*Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 853–54 (Bankr. N.D. Tex. 2003), *aff'd sub nom. Womble v. Pher Partners*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd sub nom. In re Womble*, 108 F. App'x 993 (5th Cir. 2004). "[A]n accumulation of several such factors strongly indicates that the debtor possessed the requisite intent." *Id.*

91.     The Debtor transferred Persnickety's operating assets to Uplily in July 2025, within one year of filing his bankruptcy petition on November 21, 2025. The Debtor, as the sole Owner and Manager of Persnickety, caused Persnickety to transfer its operating assets—including the intellectual property, equipment, customer relationships, and goodwill necessary to operate the Persnickety Prints Business—to Uplily, an entity the Debtor formed and controlled. The Debtor signed the Asset Purchase Agreement on behalf of both the seller (Persnickety) and the buyer (Uplily). Accordingly, the evidence establishes a transfer of the Debtor's property within one year of filing the bankruptcy petition.

92.     The Debtor also acted with intent to delay, hinder, or defraud Plaintiffs. The badges of fraud are present in abundance here:

93.     *Lack or inadequacy of consideration*. The transfer was made for grossly inadequate consideration—$115,000.00 cash for assets valued at approximately $2.7 million—a ratio of roughly 4 cents on the dollar. The Debtor himself valued Persnickety's assets at approximately $2.4 million on the balance sheet he provided to Dune in 2025—more than twenty times the price for which he arranged the sale to his own insider entity. "[G]rossly inadequate consideration" is a hallmark of fraudulent conveyances. *See Husky Int'l Elecs. Inc.*, 578 U.S. at 361–62.

94.     *Close relationship between the parties*. The transfer was made to Uplily, an entity the Debtor formed and controlled. The Debtor served as manager of Uplily and retained exclusive management authority under the Operating Agreement. Voyles, the ostensible owner, testified that

he had no involvement in negotiating the terms of the asset sale and signed the transaction documents at the Debtor's direction. The Debtor signed the Asset Purchase Agreement on both sides of the transaction—as owner of the seller (Persnickety) and as Manager of the buyer (Uplily).

95. *Retention of possession, benefit, or use of the property*. The Debtor retained the benefit of the transferred property by continuing to serve as Manager of Uplily, receiving compensation from Uplily, and operating the same Persnickety Prints Business from the same location in Argyle, Texas under a different corporate name. The evidence showed that Uplily used the same employees, equipment, customer relationships, and operational processes as Persnickety. The Debtor testified that he continued to make all major business decisions for Uplily. The Debtor further extracted a security interest in Uplily's assets through a Business Consulting Agreement after his bankruptcy petition was filed.

96. *Financial condition before and after the transaction*. Before the transaction, Persnickety and the Debtor were obliged to pay Plaintiffs' Notes, secured by Persnickety's assets. Afterwards, Persnickety's revenue was diverted to Uplily, its assets were sold off for pennies on the dollar, and now the Debtor seeks to shirk his Guaranty through Bankruptcy.

97. *Pattern of transactions after incurring debt or onset of financial difficulties*. The Debtor orchestrated the transfer after engaging SWC specifically to implement a debt default strategy targeting Plaintiffs' Notes. The sequence of events—engaging SWC, forming and controlling Uplily, executing the License Agreements to divert revenue, defaulting on the Notes, transferring operating assets to Uplily, filing bankruptcy, and obtaining a security interest in Uplily's assets—reflects a coordinated course of conduct designed to strip Persnickety of value while preserving the business for the Debtor's benefit.

98.    *Chronology of events*. The general chronology confirms the Debtor's fraudulent intent. The Debtor acquired the Persnickety Prints Business in June 2023, incurring debt to Plaintiffs documented by the Notes and Guaranty. In early 2024, the Debtor engaged SWC to plan a coordinated default. In late 2024, the Debtor formed Uplily under his absolute control. On January 2, 2025, the Debtor caused Persnickety to execute the License Agreements diverting 95% of revenue to Uplily. The Debtor then stopped making payments on the Notes and, in July 2025, transferred Persnickety's operating assets to Uplily for $115,000.00. The Debtor filed for bankruptcy four months later, in November 2025, having successfully moved the Persnickety Prints Business beyond the reach of his creditors.

99.    Accordingly, the Debtor's discharge is denied under section 727(a)(2)(A).

**v.    Objection to Discharge Under Section 727(a)(4)(A) of the Bankruptcy Code**

100.    A debtor will be denied a discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A).

101.    "[A]n objecting plaintiff (a creditor or the trustee) must prove by a preponderance of the evidence that (1) the debtor made a . . . statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case." *Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016) (citation modified); *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009).

102.    A creditor "objecting to the debtor's discharge bears the initial burden of production to present evidence that the debtor made false statements." *Duncan (In re Duncan)*, 562 F.3d 688 at 695. Once a creditor makes a prima facie showing under section 727(a)(4)(A), the burden of production shifts to the debtor. *See First Tex. Savings Ass'n v. Reed* (*In re Reed*), 700 F.2d 986,

992 (5th Cir.1983) ("[I]t is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case.").

103. Statements made in bankruptcy petitions, schedules, SOFAs, section 341 meetings, and Bankruptcy Rule 2004 exams, which are all made under penalty of perjury, are statements made "under oath." *Lambert v. Varga (In re Varga)*, Adv. No. 21-04083, 2025 WL 3273589, at *16 (Bankr. N.D. Tex. Nov. 22, 2025).

104. Two types of statements are "false" for section 727(a)(4) purposes: affirmatively untrue disclosures and "omitted statements of information where disclosure of such information in required." *Varga*, 2025 WL 3273589, at *16 (citing *CHP, LLC v. Schwyhart (In re Schwyhart)*, 618 B.R. 793, 810 (Bankr. N.D. Tex. 2020)). "The engagement of professionals, however, does not relieve a debtor of the obligation to review all sworn disclosures for accuracy before signing, and it does not in any other manner grant the debtor an amnesia pass with respect to testimony." *Id.*

105. The "knowledge of falsity" element is subsumed into the fraudulent intent analysis. *See Doctor's Hospital of Renaissance, Ltd. v. Sanchez (In re Sanchez)*, 652 B.R. 60, 76 (Bankr. W.D. Tex. 2023) (collecting cases and concluding that "[c]onflating knowledge and intent is appropriate because a debtor could not intend to deceive without knowing the statement is false"). "Circumstantial evidence may be used to prove fraudulent intent . . . and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." *Duncan*, 562 F.3d at 695.

106. A debtor's failure to correct or "an extended delay . . . in amending" sworn statements found to be untrue supports a finding of fraudulent intent. *Cadle Co. v. Guenther (In re Guenther)*, 333 B.R. 759, 768 (Bankr. N.D. Tex. 2005). Moreover, the mere fact that truthful

information may be available elsewhere to a creditor does not rectify false sworn statements. *See Cadle Co. v. Mitchell (In re Mitchell)*, 102 F. App'x 860, 863 (5th Cir. 2004) ("Debtors have a duty to answer each question truthfully, so a false answer to one question cannot be cured by providing true information in response to another question.").

107. With respect to materiality, a statement is material if it "bears a relationship to the [debtor's] transactions or estate, or concern[] the discovery of assets, business dealings, or the existence and disposition of his property." *Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir.1992)).

108. Plaintiffs have proved by a preponderance of the evidence that the Debtor made a false oath or statement. The Debtor obscured or omitted his role as manager of Uplily and HoldingCo from his bankruptcy Schedules, which he signed under oath and acknowledged should have been disclosed. He failed to include these positions in his amended schedules. Although the Debtor disclosed his ownership of Persnickety, Sunny Lark, Undg F&P, and other entities, he did not disclose that he was the manager of Uplily—the entity that had acquired all of his portfolio's operating assets—or that he was the manager of HoldingCo—the entity that had acquired his real property. The Debtor's omission was material because it concealed his continuing control over, and economic benefit from, the very assets he had transferred out of the reach of his creditors.

109. The Debtor falsely stated in his SOFA that his businesses "ceased" operations and their assets were "sold off," when in fact those businesses continued to operate through Uplily using the same employees, equipment, and customer relationships. Specifically, the Debtor stated that Sunny Lark LLC, Undg F&P LLC, and Persnickety LLC had "ceased" operations and their assets had been "sold off," implying that the businesses no longer existed. In reality, those businesses continued to operate under the Uplily name with the Debtor serving as manager and

receiving compensation. Even assuming Persnickety's operations had "ceased," the Debtor falsely stated that such closure occurred June 27, 2025—a month before the July 18 Secured Party Sales Agreement, the July 25 auction, and the July 28 Bill of Sale and Voluntary Surrender, further obscuring the transfer and its attendant circumstances.

110. The Debtor's false oaths extend beyond obscurement of his Manager roles and business operations. The Debtor omitted the $600,000.00 Business Loan Agreement with Uplily and accompanying security interest in Uplily's assets from his bankruptcy schedules and SOFA. This purported receivable would have been among his largest assets. He further failed to disclose his 100% ownership of Uplily OÜ, his interests in Drups Legacy LLC and Drups Ecosystem LP, and an associated international bank account, each of which bears on the discovery of assets and his business dealings. Moreover, while representing to the Court that he was "unemployed," the Debtor had accepted a W-2 employment offer from Uplily seven days before filing and executed the $600,000.00 consulting and loan agreements with Uplily weeks later.

111. The cumulative effect of these omissions and misstatements confirms a knowing and fraudulent pattern of false oaths. The Debtor had every reason to know that disclosing his continuing control over Uplily would reveal the fraudulent nature of his transfers and would materially affect the existence and disposition of his property. Accordingly, the Debtor's discharge is denied under section 727(a)(4)(A).

## B.    Debtor's Defenses

112. Having determined Plaintiffs have met their burden of proof on their claims, the Court now addresses the Debtor's defenses. For the reasons that follow, the Court denies the Debtor's defenses in their entirety.

### i. Good faith

113. "'Good faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing." Tex. Bus. & Com. Code §§ 1-201(b)(20), 9-102(c). The Debtor did not act in good faith. A year before the sale, Debtor made "the independent decision to default" and concocted a scheme to default on his obligations and transfer Persnickety's assets. He then diverted 95% of the revenue from Persnickety to an insider entity through License Agreements, obscured the nature of the sale from Veritex, concealed the sale entirely from Plaintiffs, and continued to derive benefit from the business. Particularly concerning were the Debtor's insistence that nothing on the newly formed entities should be in his name and the fact that the Debtor did not tell Pack about the sale despite being in communication with her regarding the status of his missed loan payments. After shedding the SBA's security interest, the Debtor filed bankruptcy to get rid of his remaining obligations. These actions demonstrate a lack of honesty in fact and a failure to observe reasonable commercial standards of fair dealing.

### ii. Commercial Reasonableness

114. The Debtor's commercial reasonableness defense lacks foundation. Plaintiffs' claims do not rise or fall with the propriety of the Article 9 foreclosure sale conducted by Veritex. Rather, Plaintiffs seek to hold the Debtor personally liable for his pre-sale scheme to divert revenue and strip assets from Persnickety, his orchestration of an insider sale to his own insider-controlled entity, and his subsequent concealment of his continuing control. To the extent commercial reasonableness is at issue, the Debtor cannot invoke Article 9 protections when he was the architect of the transaction on both sides—executing documents as "Owner & Manager" of Persnickety while directing Voyles to sign on behalf of Uplily as "Member." The Debtor's conduct falls outside the scope of any Article 9 defense.

### iii. Right to Deficiency or Surplus (UCC § 9-615)

115. Plaintiffs do not contest Veritex's right to a deficiency or the application of UCC § 9-615. Plaintiffs' claims arise from the Debtor's personal Guaranty of the Notes and his conduct in orchestrating the diversion of revenue, transfer of assets, and concealment that left Persnickety unable to satisfy its obligations. The Debtor's obligations under the Guaranty are independent of Plaintiffs' secured party rights under Article 9. The Guaranty provides that "Guarantor's obligations are independent of the obligations of Persnickety" and that Plaintiffs "may bring and prosecute a separate action or actions against Guarantor at any time." Accordingly, UCC § 9-615 provides no defense to the Debtor's personal liability.

### iv. Lack of Willful and Malicious Intent

116. As noted above, "debtors generally deny that they had a subjective motive to cause harm." The totality of the evidence analyzed in § II.A.i, *supra*, shows the Debtor was substantially certain his actions would result in harm to Plaintiffs, and resolve his "Chari issue." The Court resolves this issue in Plaintiffs' favor.

### v. Absences of Actual Fraud/Lack of Intent to Defraud or Hinder Creditors

117. Likewise, "a debtor will rarely admit to fraudulent intentions." The Debtor exhibited several "badges of fraud" identified by this District and the Fifth Circuit. *See* § II.A.ii, supra. The Debtor's fraudulent transfer scheme was nearly identical to the fraudulent conduct in Husky. Here, as there, the Court finds such evidence sufficient to show actual fraud.

### vi. No Embezzlement

118. The Debtor claims that the use of Persnickety's assets was within the scope of his authority. Having found the Plaintiffs proved the Debtor appropriated property belonging to Plaintiffs in § II.A.iii, *supra*, the Court rejects this defense.

### vii. Adequate Consideration and Value

119.    The Debtor argues that selling a $2.7 million business for $115,000.00 was adequate. Not so. While the Persnickety asset transfer did track with both the Debtor's appraisal and Veritex's, it was far from adequate; neither appraisal included a valuation of Persnickety's intangible assets. The Debtor purchased, and Plaintiffs helped finance, the acquisition of the Persnickety Prints Business for $2.7 million. Nearly all of that value was goodwill, intellectual property, domain names, and other intangibles. The Debtor claims "the valuation was set by the primary secured party." Yet, the Debtor's communications with Veritex discussed the physical assets of the business, while the sale, structured by the Debtor, conveyed *all* the business assets including general intangibles. Indeed, the Debtor's own balance sheet provided to Dune valued Persnickety's assets at approximately $2.4 million. This Court will not bless a sale of assets for four cents on the dollar.

### viii. Compliance with Notice and Process Requirements

120.    Lack of notice is relevant to Plaintiffs' claims in so far as it is one factor among many in determining whether a transfer was "willful and malicious" or as a "badge of fraud." Courts routinely consider failure to notify a creditor of an impending disposition as evidence of intent to injure. The Debtor did not give Plaintiffs any advance notice that he intended to sell Persnickety's assets through a UCC foreclosure sale. But even if Veritex's compliance with UCC notice requirements were a complete defense—and it is not—the Debtor's notice defense would still fail because the Debtor himself had independent obligations to notify Plaintiffs, which he breached.

121.    The Promissory Notes contain a "Due on Sale" clause that made "the entire balance of this Promissory Note . . . immediately due and payable upon the closure of or upon the sale of substantially all of the operating assets." Accordingly, when the Debtor sold substantially all of

Persnickety's operating assets to Uplily, Persnickety was obligated to pay the full balance due under the Notes immediately. But instead of notifying Plaintiffs that he was selling substantially all of the assets and that payment was due, the Debtor concealed the sale from Plaintiffs. The Debtor was in active communication with Pack during the weeks leading up to, and during, the sale. He exchanged emails with Pack on July 16, 17, and 18 of 2025—the very days the sale was being finalized. Yet not once did the Debtor mention that Persnickety's assets were being sold, rather, he was more concerned with finalizing the sale as quickly as possible to resolve his "Chari issue." Plaintiffs did not receive notice of the auction until after it concluded and thus were unable to protect their security interest in Persnickety's assets. To claim Plaintiffs were afforded notice and process is a bridge too far.

### ix. Reliance on the Advice of Counsel or Consultants

122. To the extent the Debtor argues reliance on SWC absolves him of any wrongdoing, he is mistaken. SWC repeatedly stated throughout negotiations that it provided templates and guidance, not legal advice. Moreover, the communications with Veritex and Pack show that the Debtor was, at the very least, just as involved in the strategy and negotiations as SWC. Indeed, the Debtor holds himself out as a successful business investor, touting his acquisition of twelve businesses, boasting 143.3% returns, claiming to beat top investment funds, and soliciting others to join in his success through his "Fast FI Club" and "Founder's Group." These claims go beyond his public persona. From the beginning of the SWC engagement, the Debtor was adamant that SWC could not understand his business portfolio without his input and demanded to be in control of communications with the SBA banks. The events leading up to and surrounding this case have not persuaded him to rely on professionals; the Debtor has continued to solicit investors and acquisition partners and to promote his "Fast FI Club" during the pendency of this case, publicly

claiming to have acquired and "turned passive" seven businesses without disclosing his bankruptcy or his defaulted obligations.

123. Reliance on his bankruptcy counsel likewise falls flat. "The engagement of professionals . . . does not relieve a debtor of the obligation to review all sworn disclosures for accuracy before signing, and it does not in any other manner grant the debtor an amnesia pass with respect to testimony." *Varga*, 2025 WL 3273589, at *16 (Morris, J.).

### x. Full Disclosure and Lack of Concealment

124. The Debtor's claim of "full disclosure" is belied by the record. The Debtor planned to default on his obligations to Veritex and Plaintiffs over a year in advance of the sale of Persnickety. The formation of Uplily as an insider entity, execution of License Agreements to divert Persnickety revenue to Uplily, obtaining an appraisal and communicating to Veritex that the sale was solely for physical assets while constructing the sale to include intangibles, negotiating a purchase price for pennies on the dollar, refusal to notify Plaintiffs about the sale even though he was in active communication with Pack during the weeks leading up to, and during, the sale all evidence the Debtor's efforts to mask the true nature of the transaction.

125. Further, the Debtor obscured or omitted his role as Manager of Uplily and HoldingCo from his bankruptcy schedules, which he signed under oath. He failed to fully disclose these positions even in his amended schedules filed after his Rule 2004 examination brought the omissions to his attention. The Debtor falsely stated that his businesses had "ceased" operations when they continued to operate through Uplily using the same employees, equipment, and customer relationships. He omitted the $600,000.00 Business Loan Agreement and accompanying security interest from his schedules entirely. Far from demonstrating transparency, the Debtor's

pattern of omissions and false statements demonstrates a calculated effort to conceal his continuing control over the very assets he transferred beyond the reach of creditors, including Plaintiffs.

### xi. Ordinary Course of Business

126. The Debtor's characterization of the challenged conduct as occurring in the "ordinary course of business" is unavailing. Defaulting on secured obligations, diverting 95% of revenues to a newly-formed insider entity, stripping a business of its workforce and operational capacity, and then selling its assets for four cents on the dollar to that same insider entity is not ordinary course conduct. The Debtor engaged SWC specifically to implement a debt default strategy targeting Plaintiffs' Notes. The License Agreements were executed within minutes of each other as part of a coordinated plan. The transfer documents were signed by the Debtor on both sides of the transaction. These actions reflect an extraordinary scheme to defraud creditors, not ordinary business operations.

### xii. Lack of Standing/No Debt Owed

127. The Debtor waived this defense when he listed the debt on his bankruptcy schedules and did not mark the box labeled "Disputed." *See In re Heaton*, No. 98-21887, 2001 WL 1175099, at *2 n.3, *3 (E.D. Pa. Sept. 28, 2001), aff'd, 43 F. App'x 506 (3d Cir. 2002) ("The debtor never contested the [debt] . . . in the debtor's own Chapter 7 proceedings" where the debtor "did not check the box labeled 'Disputed'").

### xiii. Waiver, Estoppel, or Acquiescence

128. Plaintiffs did not receive notice of the public auction until after it concluded. Plaintiffs filed a lawsuit in Utah within two months of learning the assets were sold. Plaintiffs acted swiftly to uncover the Debtor's scheme in spite of his best efforts to conceal it. Accordingly, this defense fails.

### xiv. Extinguishment

129. The Debtor's extinguishment defense fails. Plaintiffs' claims have not been extinguished by any payment, release, or satisfaction. The Guaranty is unconditional and absolute, providing that the Debtor "unconditionally and absolutely guarantees to PP the due and punctual payment and performance" of Persnickety's obligations. The Guaranty further provides that "[e]very obligation of Guarantor hereunder is the joint and several obligation of Guarantor and Persnickety Co." and that "Guarantor's obligations are independent of the obligations of Persnickety Co." The sale of Persnickety's assets for $115,000.00 did not satisfy the full amount owed under the Notes, leaving a deficiency that the Debtor personally guaranteed. The Debtor cannot claim extinguishment when he orchestrated a sale designed to leave Plaintiffs with a deficiency while preserving the business for his own benefit through Uplily.

### xv. Mitigation of Damages

130. "The party asserting failure to mitigate has the burden of proving facts showing lack of such mitigation and must also show the amount by which the damages were increased by failure to mitigate." *Moreland v. United States*, No. 3:11-CV-358-L, 2013 WL 3283700, at \*2 (N.D. Tex. June 28, 2013); *see also Reticulum Mgmt., LLC v. Dean (In re Dean)*, 620 B.R. 271, 285 n.64 (Bankr. N.D. Tex. 2020) ("Failure to mitigate damages is an affirmative defense that 'prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff.'") (citing *Great Am. Ins. Co. v. N. Austin Mun. Utility Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995)). The Debtor has not stated how Plaintiffs should have mitigated their damages nor the amount by which the damages were increased. Defendant has not adequately pled this defense and it is therefore waived.

### xvi. Attorney's Fees Not Recoverable

131. The Debtor is correct that a request for attorney's fees under 11 U.S.C. § 523 must be permitted by contract or statute. Plaintiffs are authorized to recover attorney's fees under the APA, the Security Agreement, and the Guaranty. The Debtor's defense is denied.

### xvii. Not an Insider/Owner

132. The Debtor's contention that he does not control Uplily or HoldingCo is contradicted by overwhelming evidence. Uplily and HoldingCo were critical in the Debtor's "plan to consolidate the entities." The Debtor authored the Operating Agreements which vested "exclusive management and control" in the Debtor as Manager and provided that "Manager, Joseph Terndrup, will unilaterally and at [his] own discretion make the final determination" in any disagreement. The Debtor testified that he makes all major decisions for Uplily, that there are no other managers or officers, and that he alone decides hiring, compensation, and distributions. Voyles, the ostensible owner, contributed only $1,000.00 in capital, had no involvement in negotiating the asset sale, executed documents at the Debtor's direction, and testified that he had never spoken to Pack.

133. The Debtor's control extended beyond formal governance. The Debtor negotiated the Dune financing on behalf of Uplily without input from Voyles, promising Dune that Uplily "will be asset rich, have a lot of cash, and have no loans except yours." The Debtor moved employees from Persnickety's payroll to Uplily and began receiving compensation directly from Uplily. In December 2025, after his bankruptcy petition was filed, the Debtor executed a $600,000.00 loan agreement with Uplily granting himself a security interest in all of Uplily's assets—the same assets he had sold to Uplily five months prior. The Estonian subsidiary, Uplily OÜ, lists the Debtor as a beneficial owner with "[d]irect ownership." The Debtor's claim that he is not an insider, owner, or controller of Uplily is simply not credible.

## IV. RELIEF AND PROPOSED JUDGMENT

134. For the foregoing reasons, the debt the Debtor owes to Plaintiffs is excepted from discharge under 11 U.S.C. § 523(a)(6), and in the alternative under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4).

135. The Debtor's discharge is denied in its entirety under 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A).

136. As of the Petition Date, the nondischargeable debt owed to Plaintiffs totals $584,113.81, comprising $272,856.39 due under the $300,000.00 Promissory Note and $311,257.42 due under the $272,000.00 Standby Promissory Note, together with continuing interest, late charges, costs, and attorneys' fees as provided in the Notes and the Guaranty.

137. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs under the Asset Purchase Agreement, the Security Agreement, and the Guaranty.

138. A separate judgment consistent with these Findings of Fact and Conclusions of Law will be entered.

Dated: July 27, 2026

Respectfully submitted,

By: /s/ *S. Wallace Dunwoody*

**S. Wallace Dunwoody**
Texas State Bar No. 24040838
sdunwoody@munckwilson.com
**Jenny L. Martinez**
Texas State Bar No. 24013109
jmartinez@munckwilson.com
**Taylor J. Grover**
Texas State Bar No. 24149650
tgrover@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
2000 McKinney Avenue,
1900 Texas Capital Center
Dallas, Texas 75201
Tel. (972) 628-3600
Fax (972) 628-3616

*Counsel for Plaintiffs Chari Pack and Chari Ventures, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2026, a true and correct copy of the foregoing was served electronically via the Court's CM/ECF system on all counsel of record in accordance with the Federal Rules of Bankruptcy Procedure.

/s/ *S. Wallace Dunwoody*
S. Wallace Dunwoody